UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

v.                                 CASE NO.: 8:09-cv-455-T-23TBM

SKY WAY GLOBAL, LLC, et al.,

     Defendants.

_____/

## **ORDER**

An April 22, 2010, order (Doc. 53) ("the order") grants in part and denies in part the Commission's motion (Doc. 40) for a default judgment against the defendant Sky Way Global.  To the extent that the Commission seeks a civil penalty and disgorgement, the order (Doc. 53) retains jurisdiction to enter against Sky Way Global a money judgment for an amount certain.  The order (Doc. 53) denies the Commission's request for a pervasive, permanent obey-the-law injunction (1) because an obey-the-law injunction violates Rule 65(d), Federal Rules of Civil Procedure; (2) because an obey-the-law injunction violates the defendant's constitutional rights; (3) because an obey-the-law injunction affronts the separation of powers embodied in the Constitution; (4) because an obey-the-law injunction is both unenforceable and ineffective; (5) because the Commission fails to establish an exception for an enforcement action from the general and constitutional prohibition against an obey-the-law injunction; and (6) because in this action an obey-the-law injunction against a defaulted,

unrepresented, defunct corporate defendant creates an "onerous circumstance" in which each of the four actively litigating pro se defendants falls within the scope of the injunction.  The order (Doc. 53) invites the Commission to propose a properly refined, reasonably focused, permanent injunction that complies with Rule 65(d), Federal Rules of Civil Procedure.  The Commission moves (Doc. 67) for "reconsideration" of the order and, in the alternative, proposes a "revised injunction."  In moving for reconsideration, the Commission argues (1) that Rule 65(d) permits an obey-the-law injunction in an enforcement action; (2) that an obey-the-law injunction violates no constitutional right of the defendant; (3) that an obey-the-law injunction comports with the separation of powers; and (4) that an obey-the-law injunction properly extends to each actively litigating pro se defendant.

Before addressing the Commission's motion, three points deserve mention.  First, this order and the preceding order (Doc. 53) use the term "obey-the-law injunction" to mean an injunction that compels a person to refrain from violating—in any manner and at any time or at any place—one or more statutes that, in turn, prohibit an array of categories of action.  The Commission in this action sought an injunction, quoted at length in footnote 2 in the earlier order (Doc. 53), that enjoined a person from any and every violation, whenever and whereever committed, of Sections 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.  An obey-the-law injunction prohibits not merely some adequately identified act or omission that is against the law (which is a permissible prohibition) but prohibits every act or omission (or a broad encompassing array of acts or omissions), even though unidentified or only

generically identified, if contrary to a stated law or laws (which is an impermissibly broad prohibition).

Second, the order finds that the Commission establishes facts sufficient to warrant an injunction against Sky Way Global.  Thus, no question remains as to the propriety of permanent injunctive relief.  Rather, the issue is the appropriate form of relief.  Must the injunction describe in reasonable detail (and not merely by tracking the broad language of the statute) the act or acts prohibited, by generally prohibiting either the same modus operandi or category of conduct as the conduct warranting the injunction in the first instance?  Or may the injunction, by tracking the broad, general language of a statute, impose a global, broadly indiscriminate, permanent prohibition on any future conduct that violates the statute, no matter where, when, how, or even whether related to the underlying, established violation?  In other words, may a court order a defendant to either "be good forever" or face contempt and thereby substitute entirely the remedy of contempt for the statutory remedy for breach of the pertinent statute?

The final point is the Commission's problematic claim that an obey-the-law injunction is a mechanism essential to fulfill the Commission's paramount obligation to protect investors from securities recidivists.  The Commission's claim erodes promptly upon a review of the practice of other enforcement agencies.  For example, the Federal Trade Commission (the "FTC") routinely seeks both a preliminary and permanent injunction against a defendant who demonstrates a proclivity for repeated violation of the Federal Trade Commission Act.  The FTC's duty to protect the public interest—i.e.,

consumers—is neither less important nor less burdensome than the Commission's. Nevertheless, the FTC (with relative ease and efficiency) consistently proposes a reasonably detailed injunction that prohibits the same category of act or acts as those warranting an injunction in the first instance.  For example, in <u>F.T.C. v. Home Assure, LLC</u>, No. 8:09-cv-547-T-23TBM, the FTC proposed (and received in this court) a permanent injunction against a defendant who operated a foreclosure relief business, which order (in part) enjoined (Doc. 278) the defendant from:

> Advertising, marketing, promoting, offering for sale, or selling any mortgage loan modification or foreclosure relief service; and . . . Assisting others engaged in advertising, marketing, promoting, offering for sale, or selling any mortgage loan modification or foreclosure relief service.
> . . .
> Misrepresenting or assisting others in misrepresenting, expressly or by implication, any material fact, including but not limited to:
> 1.The terms or rates that are available for any loan or other extension of credit, including but not limited to: (a)  closing costs or other fees; (b) the payment schedule, the monthly payment amount(s), or other payment terms, or whether there is a balloon payment; interest rate(s), annual percentage rate(s), or finance charge; the loan amount, the amount of credit, the draw amount, or outstanding balance; the loan term, the draw period, or maturity; or any other term of credit; (c) the savings associated with the credit; (d) the amount of cash to be disbursed to the borrower out of the proceeds, or the amount of cash to be disbursed on behalf of the borrower to any third parties; (e) whether the payment of the minimum amount specified each month covers both interest and principal, and whether the credit has or can result in negative amortization; (f) that the credit does not have a prepayment penalty or that no prepayment penalty and/or other fees or costs will be incurred if the consumer subsequently refinances; and (g) that the interest rate(s) or annual percentage rate(s) are fixed rather than adjustable or adjustable rather than fixed;
> 2.That any person can improve any consumer's credit record, credit history, or credit rating by permanently removing negative information from the consumer's credit record, credit history, or credit rating, even where such information is accurate and not obsolete;

3. Any person's ability to improve or otherwise affect a consumer's credit record, credit history, or credit rating or ability to obtain credit;
4. Any aspect of any debt relief good or service, including but not limited to, the amount of savings a consumer will receive from purchasing, using, or enrolling in such debt relief good or service; the amount of time before which a consumer will receive settlement of the consumer's debts; or the reduction or cessation of collection calls; and
5. That a consumer will receive legal representation; and
B. Advertising or assisting others in advertising credit terms other than those terms that actually are or will be arranged or offered by a creditor or lender.

If the FTC can effectively protect the public interest with a reasonably detailed, appropriately refined permanent injunction (that does more than simply track the language of the FTC Act), nothing should prevent the Commission from doing the same.

<u>Discussion</u>

*1. An Injunction Permissible Under Rule 65(d)*

Arguing that Rule 65(d) permits an obey-the-law injunction in an enforcement action, the Commission asserts that the April 22, 2010, order (Doc. 53) (1) "failed to consider the plain language of the securities laws that provide for injunctions tracking statutory language," (2) "failed to follow binding Eleventh Circuit precedent," (3) "relied on dicta that contradicts that precedent," (4) "ruled contrary to Supreme Court and other Circuit Courts finding that statute-based injunctions are permissive," and (5) "relied on case law involving private litigants[] rather than enforcement agencies entitled to statute-based injunctions."

a. The "plain language of the securities laws"

- 5 -

The Commission argues that the order (Doc. 53) "failed to consider the plain language of the securities laws that provide for injunctions tracking statutory language." Contrary to the Commission's assertion, the order exhaustively analyzes the "plain language" of 15 U.S.C. § 77t ("Section 77t"), which empowers the Commission to seek an injunction.  (Doc. 53 at 11-13)  The order finds that Section 77t permits the Commission to seek an injunction against an "act or practice" that a person "is engaged in or [is] about to engage in" and that violates the Securities Act.  Section 77t states:

> (b) Action for injunction or criminal prosecution in district court
>
> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States, or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond. . . .

15 U.S.C. § 77t(b).  The Commission's construction of the statute overreaches.  Section 77t permits an injunction against only an identifiable "act or practice" that a person "is engaged or about to engage in" and not any conceivable or imaginable act or practice that violates any part of the securities law without respect to whether a person may or is "about to" engage in the act.  Accordingly, the order finds that "Authorization to enjoin a certain, identifiable, and demonstrably imminent 'act or practice' differs markedly from authorization to enjoin any act or practice and all possible acts or practices that violate the law, wherever and whenever the act or practice occurs."  The plainest aspect of Section 77t is that Section 77t neither "explicitly" authorizes a boundless, pervasive

obey-the-law injunction nor "explicitly" permits an injunction "tracking the statutory language."  (Doc. 67, p. 6)

Additionally, the Commission cites[1] both 15 U.S.C. § 78u(a) ("Section 78u(a)") and 15 U.S.C. § 78u(e)(1) ("Section 78u(e)"), which purportedly "explicitly" authorize "the issuance of an injunction tracking the language of the securities statutes."  Section 78u(a) prescribes the "Authority and discretion of Commission to investigate violations" and states that:

> (1) The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or

---

[1] Notably, (1) in this action the Commission never cited Section 78u(e) until this motion for reconsideration and (2) the Commission fails to cite 15 U.S.C. § 78u(d), which contains language nearly identical to 15 U.S.C. § 77t and states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.

a person associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. The Commission is authorized in its discretion, to publish information concerning any such violations, and to investigate any facts, conditions, practices, or matters which it may deem necessary or proper to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates.

(2) On request from a foreign securities authority, the Commission may provide assistance in accordance with this paragraph if the requesting authority states that the requesting authority is conducting an investigation which it deems necessary to determine whether any person has violated, is violating, or is about to violate any laws or rules relating to securities matters that the requesting authority administers or enforces. The Commission may, in its discretion, conduct such investigation as the Commission deems necessary to collect information and evidence pertinent to the request for assistance. Such assistance may be provided without regard to whether the facts stated in the request would also constitute a violation of the laws of the United States. In deciding whether to provide such assistance, the Commission shall consider whether (A) the requesting authority has agreed to provide reciprocal assistance in securities matters to the Commission; and (B) compliance with the request would prejudice the public interest of the United States.

Section 78u(a) neither "explicitly" authorizes an injunction tracking the statutory language nor appears at all germane to an injunction (obey-the-law or otherwise) under the securities law.

Section 78u(e) governs "Mandamus" and states that:

Upon application of the Commission the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder, the rules of a national

- 8 -

> securities exchange or registered securities association of which such person is a member or person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, the rules of the Municipal Securities Rulemaking Board, or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title . . . .

The current language of Section 78u(e)—formerly Section 21(f) of the Exchange Act, 15 U.S.C. § 78u(f)—became a part the Exchange Act in 1975 upon the passage of certain amendments by Congress (the "1975 Amendments").  The 1975 Amendments also modified Section 78u(d)—formerly Section 21(e) of the Exchange Act, 15 U.S.C. § 78u(e)).  In order to enact "meaningful reform" of securities trading mechanisms and establish a "national market system," Congress sought in the 1975 Amendments to "reform . . . the method and manner by which the self-regulatory organizations operate and . . . the way that the [Commission] oversees the performance of their regulatory responsibilities."[2]  Accordingly, in amending Sections 21(f) and 21(e), Congress augmented the power of self-regulatory organizations by authorizing the Commission to seek a court order directing compliance with an organization's rules and orders.  As Congress describes the amendments:

> Sections 21(e) and 21(f) would empower the [Commission] to apply to a federal court for an order to (1) enjoin the violation of the rules of a self-regulatory organization, (2) command a member of a self-regulatory organization to comply with the rules of such organization, or (3) command a self-regulatory organization to enforce compliance by its members with the Exchange Act, the rules thereunder, and the organization's own rules. Before exercising a power described in (1) or (2), it must appear to the [C]ommission

---

[2] S. REP. NO. 94-75, at 2 (1975), reprinted in 1975 U.S.C.C.A.N. 179.

> (1) that the self-regulatory organization was unable or unwilling to take appropriate action or (2) that such action is otherwise necessary in the public interest or for the protection of investors. (Section 21(g)). The Committee expects the additional enforcement powers provided by the bill to lead to an increased willingness on the part of the Commission to take formal action where needed to assure adequate self-regulatory performance. Although the Congress cannot mandate such a willingness, the Committee has no reason to believe that the Commission and the other agencies granted regulatory authority under S. 249 would not be responsive to such an explicit expression of congressional intent.[3]

Thus, the purpose of Section 78u(e)—Section 21(e) of the Exchange Act—is to "authorize[] the [Commission] to move the Court for enforcement of its orders relating to disciplinary actions first initiated by self-regulatory organizations such as the NASD [renamed the Financial Industry Regulatory Authority ("FINRA")]." S.E.C. v. Pinchas, 421 F. Supp. 2d 781, 783 (S.D.N.Y. 2006); see also S.E.C. v. Vittor, 323 F.3d 930 (11th Cir. 2003); S.E.C. v. McCarthy, 322 F.3d 650, 655, 659 (9th Cir. 2003).  Section 78u(e) "explicitly provides for district court jurisdiction over [an] action[] brought to enforce SEC-ordered sanctions," as well as an action to enforce sanctions imposed by FINRA and affirmed by the Commission.  Lang v. French, 154 F.3d 217, 222 (5th Cir. 1998).

Nothing in Section 78u(e) entitles the Commission to an obey-the-law injunction that tracks the statutory language.  Rather, Section 78u(e) grants a district court jurisdiction to order compliance by a member of a self-regulatory organization with the organization's rule or order.  This fact is manifest in the title of the section—"mandamus"— which denotes a pre-existing duty or obligation to perform some ministerial act.  The Commission's independent power to seek an injunction

---

[3] S. REP. NO. 94-75, at 35 (1975), reprinted in 1975 U.S.C.C.A.N. 179.; H.R. REP. NO. 94-229 (1975), reprinted in 1975 U.S.C.C.A.N. 321.

resides in Section 78u(d), which contains language identical to Section 77t(b), and authorizes the Commission to seek an injunction against an "act or practice" that a person "is engaged in or [is] about to engage in" and that violates the Exchange Act. Accordingly, the Commission's new reliance on Section 78u(e) is misplaced, because Section 78u(e) neither "explicitly" abrogates the specificity requirement of Rule 65(d) nor "explicitly" empowers the Commission to procure an obey-the-law injunction.

Furthermore, an abundance of precedent rejects an injunction framed entirely in the broad terms of the statutory language.  See McComb v. Jacksonville Paper Co., 336 U.S. 187, 195-96 (1949) (Frankfurter, J. and Jackson, J., dissenting) ("For violation of the command of an injunction issued under the [Fair Labor Standards] Act, however, [the defendant] may not only be exposed to more severe civil penalties than the Act by its own terms imposes, but made to suffer imprisonment without benefit of jury trial. It is for such reasons that this Court has indicated again and again that a statute cannot properly be made the basis of contempt proceedings merely by incorporating a reference to its broad terms into a court order."); Express Pub., 312 U.S. at 435-36 ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."); see also Jayne W. Barnard, The Securities Law Enforcement Remedies Act of 1989: Disenfranchising Shareholders In Order to Protect Them, 65 NOTRE DAME L. REV. 32, 47 & n.115 (1989) (arguing that an obey-the-law injunction is "by definition

overbroad[] and ought not survive appellate review or support a contempt citation."); c.f. Payne v. Travenol Lab., Inc., 565 F.2d 895, 898 (5th Cir. 1978); E.E.O.C. v. Wooster Brush Co. Emp. Relief Ass'n, 727 F.2d 566, 576 (6th Cir. 1984); City of Mishawaka, Ind. v. Am. Elec. Power Co., Inc., 616 F.2d 976, 991 (7th Cir. 1980) (finding that an injunction that "merely incorporates the broad language of Section 2 of the Sherman Act" fails to satisfy the specificity requirement of Rule 65(d)); B & C Truck Leasing, Inc. v. I.C.C., 283 F.2d 163, 167-68 (10th Cir. 1960); Miglionico v. Birmingham News Co., 378 So. 2d 677, 681-82 (Ala. 1979) ("'An injunction ought not enjoin in general terms the violation of the Interstate Commerce Act.' Blanket injunctions against general violation of a statute are repugnant to the American spirit and should not lightly be either administratively sought or judicially granted.").

### b. Failure to Follow Eleventh Circuit Precedent

The Commission argues that "[t]his Court erred in failing to follow the binding Eleventh Circuit precedent in Ginsberg, Carriba Air, Blatt, and MacElvain."

The order (Doc. 53) considers both S.E.C. v. Carriba Air, Inc., 681 F.2d 1318 (11th Cir. 1982), and S.E.C. v. Ginsberg, 362 F.3d 1292 (11th Cir. 2004), and finds (1) that, to the extent Carriba Air finds in Section 77t specific authorization for an obey-the-law injunction, Carriba Air fails to either delineate a cogent statutory analysis or adequately explain the "nuisance exception" to the equitable bar against enjoining a crime, and (2) that Ginsberg "contain[s] no discussion of, and expresse[s] no opinion on, the enforceability of an obey-the-law injunction in an S.E.C. prosecution."  In fact, Ginsberg reverses the district court based on the failure to find a "reasonable likelihood"

of a future violation by the defendant.  Therefore, (1) because of the dearth of analysis of Section 77t, Carriba Air merits no consideration and (2) because Ginsberg expresses no opinion as to the validity of an obey-the-law injunction, Ginsberg is irrelevant to an analysis of both Section 77t and obey-the-law injunctions.

As to S.E.C. v. Blatt, 583 F.2d 1325 (5th Cir. 1978), and S.E.C. v. MacElvain, 417 F.2d 1134 (5th Cir. 1972), neither case persuasively supports the Commission's argument.  Although Blatt affirms in part the district court's permanently enjoining the defendants from violations of Section 10(b), Blatt (1) finds that the granting or denying of injunctive relief "rests within the sound discretion of the trial court" and (2) discusses only the "critical question in issuing the injunction and also the ultimate test on review," which consists of "whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."  583 F.2d at 1334.  Blatt neither discusses an obey-the-law injunction nor propounds any finding as to the "propriety" of "statute-based injunctive relief."  (Doc. 67, p. 7)  The same is true of MacElvain.

c. Reliance on "dicta" that contradicts precedent

The Commission argues that "reliance on footnote [fourteen] in S.E.C. v. Smyth, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005), in declining to enter the proposed injunction is misplaced," because "the issue of whether statute-based injunctions arising in Commission enforcement actions are enforceable was not raised, argued[,] or briefed, and the footnote commenting on them was dicta."  Additionally, the Commission argues that "where panel decisions conflict, courts must follow the earliest decision."

"[A] panel cannot overrule a prior one's holding even though convinced it is wrong."  United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998); Cohen v. Office Depot, Inc., 204 F.3d 1069, 1072 (11th Cir. 2000).  However, as explained in the previous section, the "binding precedent" cited by the Commission either (1) inadequately analyzes Section 77t and fails to merit adherence or (2) contains no analysis or finding as to the propriety of a statute-based, obey-the-law injunction.  Thus, although not a "holding" and, therefore, not a compulsory, binding precedent, Judge Tjoflat's footnote 14 in Smyth provides the most persuasive and immediate precedent informing the propriety of an obey-the-law injunction in an enforcement action.  Accordingly, no error arises from the order's finding in accord with footnote 14 of Smyth.  Additionally, the order (Doc. 53) (1) disapproves of the dominant trend of a court's entering with only scant analysis an obey-the-law injunction in an enforcement action and (2) disregards as persuasive precedent the Commission's undoubted history of success in obtaining obey-the-law injunctions elsewhere, because the mere number of instances, without more, neither justifies the practice nor meaningfully evidences the Commission's entitlement to such an injunction.[4]

d. The Conflict with Supreme Court and Circuit Opinions

The Commission argues that both the order (Doc. 53) and footnote 14 of Smyth are "contrary to a Supreme Court and several other Circuit Court opinions holding that

---

[4] Similarly, one commentator argues that "[t]he fact that courts have routinely entered overbroad injunctions in cases in which violations of the securities laws have been found—for example, several courts have entered broadside injunctions perpetually prohibiting any and all violations of the 1933 and 1934 Acts—is no defense to such a limitation [on a person's ability to practice his trade]."  Barnard, 65 NOTRE DAME L. REV. at 47.

injunctions tracking the statutory language are not overly broad and are not prohibited 'obey the law' injunctions."  The Commission relies primarily upon <u>McComb v. Jacksonville Paper Co.</u>, 336 U.S. 187 (1949).[5]

In December, 1939, and January, 1940, the Administrator of the Department of Labor's Wage and Hour Division (the "Administrator") inspected Jacksonville Paper Company ("Jacksonville Paper") and discovered Jacksonville Paper's failure to comply with the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206-07 (the "FLSA").  Because Jacksonville Paper operated primarily within Florida, Jacksonville Paper asserted that no part of the FLSA applied to the company's employees.  The Administrator argued otherwise and sued to enjoin Jacksonville Paper's further violating the FLSA.  The Administrator successfully obtained an injunction as to some of Jacksonville Paper's warehouses, which sold products interstate (and fell under the purview of the statute).  Both the Administrator and Jacksonville Paper appealed in <u>Fleming v. Jacksonville Paper Co.</u>, 128 F.2d 395 (5th Cir. 1942).  <u>Fleming</u> finds erroneous the district court's enjoining Jacksonville Paper "'from violating any of the provisions of the Fair Labor Standards Act of 1938,'" because "[s]uch an injunction would put the defendants in contempt of court if thereafter in any way they violated the law . . . ."  The injunction "should have been restricted to a repetition of such violations as were found to have been committed, and similar ones."  Accordingly, <u>Fleming</u> reverses and remands the

---

[5] Additionally, the Commission cites <u>Wirtz v. Ocala Gas Co., Inc.</u>, 336 F.2d 236 (5th Cir. 1964), and <u>Mitchell v. Pidcock</u>, 299 F.2d 281 (5th Cir. 1962), which cite <u>McComb</u> and uphold an injunction against violations of the FLSA.

case for entry of a modified injunction.  On remand, the district court enjoined

Jacksonville Paper from violating the FLSA:

> (1) by paying the designated classes of employees less than 30¢ an hour from the date of the judgment to October 24, 1945, or less than 40¢ an hour thereafter, except as permitted by orders of the Administrator under s 8 or s 14 of the Act; (2) by employing such employees for a workweek longer than 40 hours unless they receive compensation for employment in excess of 40 hours in the workweek at a rate not less than one and one-half times the regular rate at which they are employed; and (3) by failing to keep and preserve records as prescribed by the Administrator, particularly records of the hours worked each workday and each workweek by each of the employees and of the total wages paid to each for each workweek.

Jacksonville Paper failed to appeal the order.

Six years later, the Administrator sued to enforce the injunction, as refined by

Fleming.  Walling v. Jacksonville Paper Co., 69 F. Supp. 599 (S.D. Fla. 1947).  The

Administrator identified six payment and record keeping practices by Jacksonville Paper

that allegedly violated the FLSA.  Walling finds that "[n]one of the practices now

complained of and for which the [Administrator] [requests] . . . civil contempt were

specifically enjoined by the judgment of August 29, 1941, or by the judgment of July 3,

1943, although most of the practices were in existence at the time these orders were

entered."  Thus, the defendant could not have "willful[ly] violat[ed]" the refined injunction,

because the defendant violated none "of the specific provisions of the former judgment

prohibiting the doing of any specific thing."  Walling concludes that, although each of the

six alleged practices violates the FLSA, "[i]t does not lie within the discretionary power

of the [c]ourt to inflict punishment upon defendants for violations of the [FLSA], not

specifically imposed by the earlier judgments."  Based on this conclusion, Walling

(1) construes the Administrator's motion for contempt as an amended complaint "seeking a broadening of the injunctive orders heretofore entered in this case . . . ." and (2) enters an amended judgment enjoining Jacksonville Paper "from violating the provisions of the Fair Labor Standards Act . . . ."  Both sides appealed.

On appeal, in <u>Jacksonville Paper Co. v. McComb</u>, 167 F.2d 448 (5th Cir. 1948), the Administrator argued that the district court erred in concluding that, because none of the practices "had been actually considered before or specifically condemned and forbidden by the court" that entered the original injunction, Jacksonville Paper lacked "any wilful purpose to evade the injunction."  Rejecting the Administrator's argument, the Fifth Circuit concludes (1) that "[u]nder all the circumstances . . . the . . . conclusion is justified that there was no wilful contempt as to any of the practices which [the district court] was for the first time condemning" and (2) "that a more specific injunction was the proper way to protect the future."  The Administrator appealed.

<u>McComb v. Jacksonville Paper Co.</u>, 336 U.S. 187 (1949), reverses.  First, <u>McComb</u> finds that "[t]he absence of wilfulness does not relieve from civil contempt . . . [a]n act does not cease to be a violation of a law and of a decree merely because it may have been done innocently."  <u>McComb</u> rejects as irrelevant to contempt the defendant's intent.  Additionally, <u>McComb</u> disagrees with the notion that an injunction must specifically prohibit each illegal payment and record keeping practice before a defendant's receiving punishment.  "Such a rule," <u>McComb</u> reasons, "would give tremendous impetus to the program of experimentation with disobedience of the law . . . ."

> The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.

Accordingly, McComb approves an injunction that "[b]y its terms . . . enjoin[s] any practices which [a]re violations of th[e] . . . [minimum wage, overtime, and record keeping] provisions."  In approving the injunction, McComb states that a "decree of that generality"—that is, an injunction that goes beyond prohibiting the specific scheme or schemes that the defendant perpetrated or may perpetrate—is "often necessary to prevent further violations where a proclivity for unlawful conduct has been shown."  For example, rather than requiring that an injunction identify each possible method by which an employer may circumvent the minimum wage requirement, an injunction may simply order an employer to pay a minimum wage.  That way, the injunction is both precise enough to give an employer fair warning of the prohibited conduct and general enough to prevent the employer's evading the injunction by simply inventing a new method of circumventing the minimum wage requirement, which method the highly specific injunction failed to identify.

The Commission asserts that McComb's approval of a "decree of . . . generality" supports the Commission's request for an obey-the-law injunction.  However, the Commission's argument arises from a fundamental misunderstanding of McComb (a

misunderstanding of which the dissenters in <u>McComb</u> were presciently aware).[6]  The

injunction approved by the majority in <u>McComb</u> precisely delineated the prohibited

conduct and provided unambiguous notice of the exact wage, hour, and record keeping

requirements of the injunction.  Although characterized in <u>McComb</u> as a "decree of . . .

generality," the injunction is both reasonably detailed and appropriately refined (no

doubt as a consequence, in large part, of the highly precise dictates of the FLSA).  The

injunction requires the employer to pay each employee not less than thirty cents an hour

to a specified date and to pay not less than forty cents an hour afterward.  The

injunction describes the exact hours (forty) in excess of which the employer must pay

overtime compensation.  The injunction informs the employer that the employer must

retain daily and weekly records of hours worked and wages paid.  In other words, the

injunction proscribes three specific and unambiguous acts.

---

[6] Dissenting in <u>McComb</u>, Justice Frankfurter astutely observes the problem with the majority's blanket approval of a "decree of . . . generality" or an injunction that simply incorporates by reference the broad terms of a statute:

> In such a case as this, only after an administrative order has been formulated and a court has adjudicated that the order is within the administrator's statutory authority does the command of a court come into existence, disobedience of which may be punished as contempt.  For violation of the Fair Labor Standards Act as such, one may be made to suffer civil penalties or imprisonment, but the latter only after conviction by a jury.  For violation of the command of an injunction issued under the Act, however, he may not only be exposed to more severe civil penalties than the Act by its own terms imposes, but made to suffer imprisonment without benefit of jury trial.  It is for such reasons that this Court has indicated again and again that a statute cannot properly be made the basis of contempt proceedings merely by incorporating a reference to its broad terms into a court order.  These considerations become increasingly important as there is increasing use of injunctions for the enforcement of administrative orders and statutory duties.

336 U.S. at 195-96.  Therefore, "courts should be explicit and precise in their commands and should only then be strict in exacting compliance.  To be both strict and indefinite is a kind of judicial tyranny."  336 U.S. at 195.

In contrast, the Commission seeks (for example) to enjoin Sky Way Global from violating Section 10(b) of the Exchange Act by (directly or indirectly):

> using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Rather than support the Commission's requested injunction, McComb highlights the problem with an injunction tracking the language of the securities laws.  The Exchange Act, for example, prohibits an expansive, indefinite category of acts and omissions, generally encompassing any imaginable fraudulent or deceptive scheme in connection with the purchase or sale of any kind of security.  In contrast, the FLSA narrowly proscribes the failure to pay a defined minimum wage and rate of overtime compensation.  The detail inherent in the FLSA permits an injunction that simply commands the defendant to comply with an FLSA provision or provisions (as would the command of statute mandating the purchase of car insurance before driving, or compliance with the applicable speed limit).  Accordingly, an injunction ordering compliance with the FLSA's minimum wage requirement easily satisfies Rule 65(d).  On the other hand, the Exchange Act permits no such injunction, because the Exchange Act utterly lacks a comparable level of detail.  An employer enjoined from violating the minimum wage requirement knows that failure to pay the minimum wage will result in contempt, but a company enjoined from violating (generally and in any way) the

Exchange Act faces a limitless array of scenarios sufficient to warrant a sanction for contempt.  Thus, <u>McComb</u> aptly demonstrates that the problem with an injunction's commanding compliance with the securities laws is not the mere fact that the injunction tracks the statutory language—the problem with ordering a defendant to obey the securities laws (and commanding no more than compliance with the broad dictates of the Securities Act, the Exchange Act, and Rule 10b-5) is the daunting breadth and complexity of the statutory (and accompanying regulatory) language.  If the Exchange Act were as precise in each requirement as the FLSA (or, for that matter, as the car insurance statute), an injunction commanding compliance with a requirement of the Exchange Act would easily satisfy Rule 65(d).  However, the Exchange Act is anything but precise (and perhaps necessarily so).  The Exchange Act consists of a set of expansive, all-encompassing prohibitions and, thus, in order to comport with Rule 65(d) an injunction commanding compliance with the Exchange Act must contain a more refined operative command capable of ascertainment and enforcement.[7]

### e. Failure to Consider Public Policy

The Commission argues that, in declining to enter the Commission's proposed injunction, the order (Doc. 53) (1) fails to consider the "strong public policy reasons for broad, statute-based injunctions in the context of [a] civil enforcement action" and (2) errs in relying "extensively on cases where private parties sought injunctions not

---

[7] In support of reconsideration, the Commission also cites <u>United States v. Corn</u>, 836 F.2d 889, 892 (5th Cir. 1988); <u>S.E.C. v. Manor Nursing Ctr.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972); <u>S.E.C. v. Keller Corp.</u>, 323 F.2d 397, 402-03 (7th Cir. 1963); <u>Hillsborough Inv. Corp. v. S.E.C.</u>, 276 F.2d 665, 667-68 (1st Cir. 1960).  However, the order (Doc. 53) explains (Doc. 53, pp. 17-18) that each case lacks persuasive authority because each contains only meager (if any) analysis of the propriety or enforceability of an obey-the-law injunction.

involving the federal securities laws . . . [and] [t]he prophylactic law enforcement deterrence of a reasonable statutory injunction was not at issue."

Although some cases cited in the order (Doc. 53) involve no enforcement agency, the order (Doc. 53) specifically considers (1) public policy, (2) the Commission's role in protecting the investing public, and (3) the deterrent power of an obey-the-law injunction.  The order both describes in-depth why an obey-the-law injunction is unenforceable and ineffective (Doc. 53, pp. 13-15) and illustrates how the Commission's "'current practice of privileging hope (in the form of an obey-the-law injunction) over experience (the many cases in which fraud defendants recidivate)' neither deters violators nor protects investors."[8]   Rather than fail to "consider" public policy, the order (Doc. 53) exhaustively considers the issue and rejects the Commission's position.  The order (1) notes the Commission's reluctance to refer cases to the Department of Justice for criminal prosecution and (2) finds that "the pursuit of a securities recidivist is rightly the business of the Attorney General and the grand jury, as Congress intended, and not the Commission or the district judge."  Accordingly, the Commission's argument that the order (Doc. 53) fails to consider public policy (and that public policy favors ineffective civil sanctions) lacks merit.

*2. An Obey-the-Law Injunction's Effect on a Defendant's Constitutional Rights*

a. The Seventh Amendment Right to a Jury Trial

The Commission argues that both the order (Doc. 53) and <u>Smyth</u> "incorrectly suggested defendants in civil contempt proceedings resulting from Commission statute-

---

[8] Jayne W. Barnard, <u>Evolutionary Enforcement at the Securities and Exchange Commission</u>, 24 (William & Mary Law Sch. Research Paper No. 09-19), <u>available at</u> http://ssm.com/abstract-1520697.

based injunctions are entitled to a jury trial," because "defendants in Commission civil contempt actions do not, by statute, have a right to a jury trial."

However, the order never "suggests" that a defendant in a civil contempt proceeding possesses the right to a jury trial.  In fact, the order both describes the federal statute depriving the defendant of the right to a jury trial in a contempt hearing and discusses in detail the fact that a defendant enjoys no right to a jury trial in a civil contempt proceeding.  The order explains the precise problem with an obey-the-law injunction: a defendant who once violates the law and, after a jury trial, becomes subject to an obey-the-law injunction never again enjoys the right to a jury trial, no matter how distinct in time, nature, and location any subsequent offense from the original offense. The obey-the-law injunction subjects the defendant to prosecution by motion for any conceivable act or practice that violates the law, whenever and wherever the act occurs, irrespective of the similarity between the new violation and the violation underlying the injunction.  Thus, the order thoroughly considers the fact that, in "civil contempt hearings the government litigates," a defendant enjoys no right to a jury trial.  Accordingly, the Commission's argument for reconsideration on this point lacks merit.

b. The Defendant's Due Process Rights

The Commission argues that the order's (Doc. 53) concern with the defendant's due process rights is "misplaced" (1) because the "inherent power to enforce . . . orders through civil contempt does not terminate if the person subject to the order relocates or if their violative conduct occurs outside of the jurisdiction" and (2) because "the Commission can only seek civil contempt."

As to the "inherent power" of a court, the Commission once again fails to comprehend both <u>Smyth</u> and the order (Doc. 53).  The crucial problem with an obey-the-law injunction is that the court retains jurisdiction in perpetuity to enforce an injunction through civil contempt, no matter where or when or of what character the next violation.  An obey-the-law injunction transforms the judge into the enforcing agent and instrument, charged forever with enforcing the securities laws against the defendant.  Through an obey-the-law injunction, a defendant who once violates the securities laws (and demonstrates a proclivity for violating the law again) forfeits in perpetuity not only his right to due process but his right to a jury trial and "the benefit of a full measure of pleadings, motions, discovery, and the like . . . ."  The due process concern with an obey-the-law injunction is anything but "misplaced."  Furthermore, the Commission is not limited to civil contempt sanctions.[9]

### c. The Separation of Powers

The Commission argues that the order (Doc. 53) incorrectly finds that the proposed injunction violates separation of powers, because the order "overlooks the fact that . . . Congress specifically authorized injunctions that track the language of the

---

[9]      [A]lthough both criminal and civil contempt sanctions are employed to enforce SEC obey-the-law injunctions, in most circumstances the Commission pursues criminal rather than civil contempt. Besides the fact that criminal sanctions are more punitive and burdensome, the SEC's preference for criminal sanctions is attributable to the fact that obey-the-law injunctions are usually crafted in negative form, prohibiting the defendant from engaging in specified kinds of conduct. When a defendant violates a decree, a civil contempt sanction is often inappropriate because the prohibited action has already been consummated, and neither a compensatory nor a coercive contempt order will provide a suitable remedy.

David M. Weiss, <u>Reexamining the SEC's Use of Obey-the-Law Injunctions</u>, 7 U.C. DAVIS BUS. L.J. 6 n.20 (2006).

statutes."  The order (Doc. 53) "overlooks" nothing of the kind.  Indeed, for the reasons

stated in the order (Doc. 53) and on reconsideration, the Commission's argument lacks

merit.  Congress authorized no injunction tracking the language of the securities laws,

and even if Congress had authorized such an injunction, Congress lacks the power to

authorize by statute an injunction that transfers power from one branch of government

to another.

d. The Injunction's Inclusion of Individuals In Active Concert
or Participation with Sky Way Global

The order (Doc. 53) criticizes the Commission's proposed injunction, because:

> the Commission proposes an obey-the-law injunction that by force of
> Rule 65(d)(2) binds not only the corporate entity, Sky Way Global,
> but also Sky Way Global's "officers, agents, servants, employees,
> and attorneys; and other persons in active concert" upon receiving
> "actual notice" of the injunction.  Each of the four individuals
> defending against this action is within the scope of the obey-the-law
> injunction as fortified by Rule 65(d)(2), which creates an onerous
> circumstance in which an actively litigating [pro se] defendant is
> subject to the sanctions visited upon a defaulting corporate
> defendant even though the individual defendant persists in his
> defense.

The Commission argues for reconsideration on the basis (1) that the order "fails to

acknowledge the proposed injunction is not a wholesale injunction against the remaining

defendants" and (2) that Rule 65(d) "expressly provides that injunctions can extend to

individuals when they act in active concert or participation with the enjoined party."

However, the Commission fails to acknowledge (or explain why) an actively litigating,

pro se defendant should become—by virtue of both Rule 65(d) and a defaulted,

unrepresented corporate defendant—susceptible to sanction.  Thus, the Commission's

argument again lacks merit.

*3. The Commission's "Revised Injunction"*

The Commission states that the "revised injunction" (Doc. 67-2) satisfies the order's (Doc. 53) "concerns under Rule 65(d)," because the injunction "includes language relating more specifically to the misconduct that occurred in this case."

The "revised injunction" mirrors the first proposed injunction by tracking the statutory language.  In fact, part one of the revised injunction contains no perceptible "revision."  Parts two and three of the "revised" injunction enjoin the defendant from violating the law "including by" engaging in the same unlawful conduct that Sky Way Global admits by virtue of default.  The "revised injunction" fails to comply with the order (Doc. 53) and Section 77t.

<u>Conclusion</u>

To the extent that the Commission seeks a permanent, obey-the-law injunction, the motion (Doc. 67) is **DENIED**, because the Commission presents no argument meriting a departure from the previous order (Doc. 53).  To the extent that the Commission seeks entry of the "revised injunction" (Doc. 67-2), the motion (Doc. 67) is **DENIED**.  Pursuant to Rule 65(d), Federal Rules of Civil Procedure, the defendant Sky Way Global, LLC, is **PERMANENTLY ENJOINED** from violating Sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, (1) by disseminating false and misleading press releases, marketing materials, offering materials, or other public statements about Sky Way Global's business and assets in order to increase either the share price or the trading volume and simultaneously selling

shares to the public (a so-called "pump-and-dump scheme"); (2) by falsely stating that

an investor could exchange shares of Sky Way Global for publicly traded stock; or

(3) by engaging in the unregistered offer or sale of shares of Sky Way Global.[10]

ORDERED in Tampa, Florida, on September 1, 2010.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

_____

[10] A somewhat broader injunction is probably warranted, but the Commission's unhelpful response to the invitation to propose another injunction interferes with the framing of an optimal order.