UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.                                         CASE NO.: 8:09-cv-455-T-23TBM

KENNETH R. KRAMER, et al.,

      Defendants.

_____/

## **ORDER**

The Commission sues (Doc. 1) to permanently enjoin the defendant Kenneth R.

Kramer from violating the broker registration requirement under Section 15(a)(1) of the

Exchange Act, 15 U.S.C. § 78o ("Section 15(a)").  The Commission also seeks a penny

stock bar, disgorgement, pre-judgment interest, and a civil penalty.  A bench trial, during

which the Commission presented evidence of alleged broker conduct, commenced on

January 18, 2011, and ended on January 27, 2011.  Kramer raised several objections

pertaining to both the admissibility and the sufficiency of the evidence, which objections

remain pending and include (1) Kramer's objection (Doc. 69) to Magistrate Judge

Thomas B. McCoun, III,'s order denying Kramer's motion to compel a deposition of the

Commission under Rule 30(b)(6), Federal Rules of Civil Procedure; (2) Kramer's

"omnibus motion in limine" (Doc. 145); (3) Kramer's motion (Doc. 188) for sanctions;

and (4) Kramer's motion "for judgment on partial findings, directed verdict, involuntary

dismissal, and/or judgment as a matter of law" (Doc. 196).   Additional pending matters include Docs. 172, 174, and 180.

I. Pending Matters

*1. Baker's Statement as Recorded in the Commission's
Investigative Transcripts on July 18, 2006, and May 23, 2007*

At trial, the Commission moved to introduce into evidence certain excerpts of Bruce Baker's statement to the Commission as transcribed in 2006 and 2007 during the Commission's investigation of Skyway.   The Commission argues that, because Baker is "unavailable" as defined by Rule 804(a), Federal Rules of Evidence, Baker's statements are admissible under Rule 804(b)(3).[1]   Alternatively, the Commission argues for admission under Rule 807.   Kramer moves (Doc. 145) to exclude Baker's statements and argues (1) that no statement by Baker during the Commission's investigation is either corroborated or cross-examined; (2) that Kramer possesses a right to confront and cross-examine Baker; (3) that the Commission's regulations prohibited Kramer's participating in, and cross-examining Baker during, the Commission's investigative

---

[1] Rule 804(b)(3) renders admissible an unavailable declarant's "statement against interest," which consists of a statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

- 2 -

inquiry;[2] and (4) that Baker's statements inherently lack trustworthiness and reliability. The Commission proffered the statements for the record, but a determination as to admissibility was reserved.

Rule 804, Federal Rules of Evidence, excepts from exclusion certain hearsay if the declarant is unavailable as a witness.  Rule 804(a) defines "unavailability as a witness" to include the situation in which a declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . or testimony . . . by process or other reasonable means."  See Walden v. Sears, Roebuck & Co., 654 F.2d 443, 446 (5th Cir. 1981) (finding that "[t]he crucial factor is not the unavailability of the witness but rather the unavailability of his testimony.").  Service of process, in this instance, falls under Section 78aa(a) of Title 15, United States Code, which authorizes nationwide service of a subpoena to compel the attendance of a witness in a securities enforcement action.  Additionally, under 28 U.S.C. § 1781, if the witness is a United States national or resident and is located in a foreign country, the witness is amenable to subpoena under 28 U.S.C. § 1783.  In a civil case, the proponent's burden accords with Rule 804(a), which requires that the proponent show an inability to procure the witness's testimony by reasonable means.  In a criminal case,[3] the prosecution must show both exhaustion of each statutory provision

---

[2] See 17 C.F.R. 203.7(b).

[3] Kramer argues that this action is "quasi-criminal" in nature.  Although no persuasive precedent establishes that a securities enforcement action is "quasi-criminal," the Commission's request for a civil penalty undoubtedly lends criminal character to the proceeding.  See United States v. Sanchez, 520 F. Supp. 1038, 1040 (S.D. Fla. 1981); S.E.C. v. Shanahan, 504 F. Supp. 2d 680, 683 (E.D. Mo. 2007); but see S.E.C. v. Sirianni, 334 F. App'x 386, 389 (2d Cir. 2009).  The Commission offered no opposition either in briefing or at trial to Kramer's "quasi-criminal" characterization.

authorizing a subpoena and a "good faith effort" to obtain the declarant's voluntary appearance.  5 WEINSTEIN'S FEDERAL EVIDENCE § 804.03.  If the proponent cannot find the witness, "process obviously cannot be effective."  The proponent "must, however, establish that the witness cannot be found."  2 MCCORMICK ON EVIDENCE § 253 (6th ed.).

If the proponent fails to satisfy Rule 804, the proponent may nonetheless seek admission of the statement under Rule 807, which provides a residual exception for a statement not covered by either Rule 803 or Rule 804.  Rule 807 requires, however, "equivalent circumstantial guarantees of trustworthiness" and (1) that the statement constitute evidence of a material fact, (2) that the statement possess more probative value on the point than any other evidence that a proponent could procure through "reasonable efforts," and (3) that "the general purposes of the[] rules and the interests of justice will best be served by admission of the statement into evidence."  An excepted and admissible hearsay statement is nonetheless susceptible to exclusion under Rule 403.

As to the "unavailability" of Baker's testimony, the Commission asserts (1) that Baker maintains a "nomadic lifestyle" and lives (the Commission says 285 days of the year) invariably in a Marriott hotel, in the United States (but often elsewhere, according to Baker); (2) that, because of Baker's attempts to evade service, the Commission obtained permission to serve Baker by e-mail with the complaint; (3) that the Commission continues to serve Baker by e-mail; (4) that the Commission questioned Kramer, James Kent, Brent Kovar, Baker's lawyer, and opposition counsel in a bankruptcy action against Baker about Baker's location; (5) that Baker's bankruptcy

counsel informed the Commission of Baker's purported statement that Baker was living in "Red Communist China"; (6) that the Commission unsuccessfully mailed a package to an address in Donguan, China, and called a telephone number in China; and (8) that the Commission attempted to deliver a subpoena to Baker at an address in Las Vegas, Nevada.

Concerning Baker's whereabouts, the Commission presented three witnesses, Mark Wolfson, Joshua Anderson, and Gregory Brown.  Wolfson is a partner at the law firm Foley & Lardner, LLP, and represents World Capita Communications, Inc., the successor to Skyway following Skyway's bankruptcy re-organization.  Wolfson filed an adversary proceeding against Baker approximately two years ago and attempted to locate Baker in the fall of 2010.  (Before the fall of 2010, Wolfson successfully served Baker with the complaint at a Tampa-area Marriott.)  Based on statements by both Baker and Baker's counsel, Wolfson "believes" that Baker resides in China.  Anderson works as a "legal technician" for the Commission in the division of enforcement.  On October 15, 2010, Anderson e-mailed Baker and wrote "per Ms. Berlin" and "please see attached."  Attached to the e-mail was a cover letter and trial subpoena.  After sending the e-mail, Anderson received a "delivery status notification," which confirmed that the e-mail reached Baker's e-mail address (but not that Baker read the e-mail).  Brown works for a process server in Las Vegas, Nevada.  In October, 2010, Brown received from the Commission a package to deliver to Baker and an address for delivery.  Upon arriving at the address, Brown found a corporate building with an unfurnished, unoccupied suite.  Unable to find Baker at the address, Brown departed.

As an initial matter, Baker's statement that he lives in China is both inadmissible hearsay and highly suspect.  According to the Commission, Baker has exerted himself impressively to evade service and otherwise avoid accountability.  Baker's statement to his lawyer as to his whereabouts undoubtedly (and quite obviously) possesses the lowest possible probative value.  Nonetheless, the Commission relied substantially on Baker's statement of his purported location and neither confirmed Baker's departure from the United States nor confirmed Baker's arrival in China.  The Commission attempted neither to serve nor to depose Baker abroad (through the procedure provided by the Hague Convention) nor to procure the assistance of local authorities, local counsel, or the United States Consulate in China.  The Commission retained nobody to help locate Baker either in China or in the United States.  Rather, the Commission (1) talked to people with neither confirmed knowledge of Baker's whereabouts nor an incentive to disclose, if they knew; (2) attempted to deliver a trial subpoena to an unfurnished, unoccupied commercial address; (3) mailed a package to an address and called a telephone number in China based on an unverified, unexplored assertion by a nomadic, unresponsive, evasive defendant; and (4) sent an e-mail, the fate of which is unknown and unknowable.  In other words, the Commission established neither the impossibility of finding Baker (for the purpose of service of process) nor the application of reasonable means to procure Baker's testimony.  The Commission appears not to have diligently attempted to locate Baker but rather to have attempted to ostentatiously fail to locate Baker.

Nonetheless, even assuming (1) that the Commission's evidence of unavailability in fact satisfies either a "good faith" or "reasonableness" standard under Rule 804(a) and (2) that Baker's statements qualify under Rule 804(b)(3), the statements merit exclusion under Rule 403. The un-cross-examined statement of a fugitive co-defendant possesses singularly low probative value. The risk of unfair prejudice easily and substantially outweighs whatever value the statements contain.

To the extent that Baker's statements are not merely cumulative but present new, additional evidence of purported broker conduct by Kramer, the statements are wholly uncorroborated and unreliable. Rule 807 requires "equivalent circumstantial guarantees of trustworthiness." The Commission asserts that Baker's both retaining counsel and avoiding "blame shifting" in Baker's statements provide some indicia of trustworthiness. However, the Commission's view ignores the countervailing, unsettling indicia of untrustworthiness, the most telling of which is the fugitive status of the declarant. By evading legal process, Baker avoids cross-examination and accountability as to each statement that inculpates Kramer. For example, Baker assuredly understood after his first encounter with the Commission that Baker faced legal action for his conduct on behalf of Skyway. Baker terminated the examination and returned after obtaining counsel. After Baker's second visit with the Commission, Baker absconded. Baker's state of mind at each stage, his hostility or other attitude toward Kramer at a given moment, his perception of his best interest or his exposure, his motives, his fears, and his plans, among other things, are utterly unknown, although highly probative of

credibility.[4]  Furthermore, the Commission fails to show (as required by Rule 807) that

Baker's un-cross-examined statements are more probative than any other evidence that

the Commission could procure with reasonable effort.  For example, Baker states that

_____

[4] As U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1286-87 (11th Cir. 2001) (Black, J.), explains, hearsay presents evidence neither challenged nor refined by the "rigors of cross-examination" and "first-hand scrutiny". "As a result, hearsay can be unreliable . . . for instance, in the context of the Confrontation Clause, hearsay that does not fall within a firmly-rooted exception is presumed unreliable.  Due to its unreliability, hearsay can be misleading and unfairly prejudicial."  Although Tieco notes that the Sixth Amendment's Confrontation Clause is inapplicable in a civil case, Tieco relies on Sixth Amendment precedent to illustrate the unreliability of hearsay admitted in a civil case.  261 F.3d at 1287 & n.13.

As in Tieco, in this action (whether classified as civil or quasi-criminal) a Sixth Amendment analysis aptly demonstrates the problem with admitting Baker's un-cross-examined statements to the Commission.  In this instance, Baker's statements are testimonial in nature, i.e., the statements occurred during an interrogation by the Commission, a law enforcement agency.  Crawford v. Washington, 541 U.S. 36, 50-53 (2004) (Scalia, J.) (stating that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.").  In a criminal case, as Crawford explains:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability."  Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule.  Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation.  To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.  Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses ... is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

541 U.S. at 61-61.  Baker's statements implicate Kramer, Baker's co-defendant in a securities enforcement action alleging a fraudulent scheme (in which Kramer allegedly participated as an unregistered broker) to artificially inflate share prices and reap an ill-gotten profit.  Baker's statements occurred under oath, albeit in the absence of cross-examination, which as Crawford explains presents the best method of determining truth.  Even if not classified as testimonial (which the statements undoubtedly are), Baker's statements bear no particularized guarantee of trustworthiness, see Ohio v. Roberts, 448 U.S. 56 (1980), and fall squarely within no exception to the hearsay prohibition.  The Commission presented no evidence corroborating Baker's statements, and the circumstances under which Baker gave the statements (and under which the Commission seeks to admit the statements) provide nothing to support Baker's credibility.  In fact, the circumstances provide an ample basis for questioning Baker's credibility.  However, absent the opportunity to cross-examine Baker, Baker's credibility and the reliability of his statements remains untested and unknown.

Kramer organized approximately a hundred "broker events."  Yet the Commission fails to offer the testimony of anyone who either hosted, attended, or possessed some personal knowledge of an event.  The Commission offers Baker's statement that Kramer telephoned potential investors and instructed potential investors to purchase Skyway shares.  However, the Commission offers the testimony of no one (other than Kramer's intimate, Krohn) who received by telephone or by any other means Kramer's purported advice as to the purchase of Skyway shares.

Even if susceptible to admission under a hearsay exception, Baker's statements unquestionably lack reliability.  Thus, even if admitted into evidence, the statements would merit neither consideration nor credit.  Accordingly, Kramer's motion (Doc. 145) in limine is **GRANTED** as to Baker's statements in the Commission's 2006 and 2007 investigative transcripts, and each statement is excluded from the evidence.

*2. Kramer's Objection[5] to the Magistrate Judge's Order*
*Denying a Rule 30(b)(6) Deposition of the Commission*

On April 19, 2010, Kramer moved (Doc. 47) to compel the Commission's deposition under Rule 30(b)(6), Federal Rules of Civil Procedure.  Kramer's notice requested that the Commission designate one or more persons to testify on the Commission's behalf as to:

> The specific facts, information, documents, and/or other evidence specifically relied upon by the [Commission], which support a specific cause of action and claim(s) for relief asserted by the [Commission], specifically against Mr. Kramer . . . which asserts, <u>inter</u> <u>alia</u>, that Mr. Kramer violated the Broker Dealer Registration provisions of the Exchange Act.

---

[5] Kramer's objection inadvertently remained unexamined until Kramer again raised the objection in moving to amend Magistrate Judge McCoun's pre-trial order.

The Commission opposed the motion and argued (1) that the information Kramer

sought in a Rule 30(b)(6) deposition qualified as protected attorney work product,

(2) that Kramer's request for a Rule 30(b)(6) deposition amounted to "an attempt to

depose opposing counsel," and (3) that Kramer could learn by other means the facts

underlying the Commission's allegations.  Magistrate Judge McCoun denied Kramer's

motion.  Kramer objected (Doc. 69) to the order (Doc. 66) and asserted that the order

"was both clearly erroneous and contrary to law" based on Rule 30(b)(6), Federal Rules

of Civil Procedure, and applicable case law.  The Commission responded (Doc. 79) in

opposition and argued (1) that "the Commission has already produced all the

documents it has . . . [,] the Commission has no independent knowledge of these

documents, and . . . the only remaining knowledge as to the basis of the Commission's

claim against Kramer is the importance the Commission gives to each document and

other evidence" and (2) that "[n]either undersigned counsel nor the Commission counsel

assigned to investigate this matter will appear as witnesses at trial."

Rule 72(a), Federal Rules of Civil Procedure, permits a party to object to a

magistrate judge's order on a non-dispositive, pre-trial matter within fourteen days after

service of the order.  Rule 72(a) requires, upon consideration of a timely objection, an

order modifying or vacating a magistrate judge's order to the extent that the order "is

clearly erroneous or is contrary to law."  "A finding is 'clearly erroneous' when although

there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed."  United States v.

United States Gypsum Co., 333 U.S. 364, 395 (1948).  "An order is contrary to law

'when it fails to apply or misapplies relevant statutes, case law or rules of procedure.'" Tompkins v. R.J. Reynolds Tobacco Co., 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000).

In this instance, Magistrate Judge McCoun denied (Doc. 66) Kramer's motion to compel a Rule 30(b)(6) deposition of the Commission (1) because a deposition would "necessarily inquire on" the work product doctrine and deliberative process privilege[6] "given that the investigation was conducted solely by counsel for the SEC, none of whom have been identified as witnesses in this cause" and (2) because Kramer failed to "undertake any alternative discovery, either by way of interrogatories, requests for production, or requests for admission, despite the fact that the facts surrounding the SEC's case appear discoverable by these means."

Rule 30(b)(6) permits a party to notice the deposition of "a governmental agency" and requires that the notice "describe with reasonable particularity the matters for examination."  Upon receiving a notice, the agency must "designate one or more officers, directors, or managing agents, or designate other persons to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization."  "The Rule 30(b)(6) deponent must make a 'conscientious good-faith endeavor to designate the persons having knowledge of the matters sought' and to prepare those persons so they can 'answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters.'" F.T.C. v. CyberSpy Software, LLC, 2009

---

[6] Rule 26(b)(3) provides that "documents and tangible things prepared in anticipation of litigation are not discoverable unless the party seeking disclosure demonstrates 'substantial need of the materials . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.'" F.T.C. v. CyberSpy Software, LLC, 2009 WL 2386137, *2 (M.D. Fla. 2009).

WL 2386137, *1 (M.D. Fla. 2009) (Presnell, J.) (quoting <u>S.E.C. v. Morelli</u>, 143 F.R.D. 42, 45 (S.D. N.Y. 1992)).  Rule 30(b)(6) expressly applies to a government agency and provides neither an exemption from Rule 30(b)(6) nor "special consideration concerning the scope of discovery, especially when [the agency] voluntarily initiates an action." <u>S.E.C. v. Collins & Aikman Corp.</u>, 256 F.R.D. 403, 414 (S.D. N.Y. 2009); <u>United States ex rel. Fry v. Health Alliance of Greater Cincinnati</u>, 2009 WL 5227661, *2 (S.D. Ohio 2009) (citing <u>Yousuf v. Samantar</u>, 451 F.3d 248, 255 (D.C. Cir. 2006)).[7]

"It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." <u>Salter v. Upjohn Co.</u>, 593 F.2d 649, 651 (5th Cir. 1979).[8]  A party typically faces much greater difficulty establishing a basis for prohibiting a deposition, because "the need for protection usually cannot be determined before the examination begins, and a motion can be made if any need for protection emerges during the course of the examination." CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, 8A FEDERAL PRACTICE & PROCEDURE § 2037 (3d ed.); <u>S.E.C. v. Dowdell</u>, 2002 WL 1969664, *2 (W.D. Va. 2002).  Furthermore, "the deposition-discovery rules are to be accorded a broad and liberal treatment.  No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case."

---

[7] In some cases, however, the Commission has successfully avoided a Rule 30(b)(6) deposition based on the work-product privilege, see <u>In re Bilzerian</u>, 258 B.R. 846, 848-50 (M.D. Fla. 2001); <u>S.E.C. v. Buntrock</u>, 2004 WL 1470278 (N.D. Ill. 2004); <u>S.E.C. v. Rosenfeld</u>, 1997 WL 576021 (S.D. N.Y. 1997); <u>S.E.C. v. Morelli</u>, 143 F.R.D. 42, 45-46 (S.D. N.Y. 1992), to the extent that the Commission otherwise produces the documents and information collected in the Commission's investigation and to the extent that the opposing party may obtain additional, non-privileged information by other, less intrusive means.

[8] <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981), renders binding each opinion of the former Fifth Circuit Court of Appeals decided on or before September 30, 1981.

Hickman v. Taylor, 329 U.S. 495, 507 (1947) (stating that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."). If, however, "the examination is being conducted in bad faith or in such a manner as to annoy, embarrass[,] or oppress the person subject to the inquiry," a limitation arises. 329 U.S. at 507-08. "[F]urther limitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege." 329 U.S. at 507-08.

In this instance, Magistrate Judge McCoun relied upon the Commission's assertion that, because Commission counsel lacked "independent knowledge" of the facts and because only Commission counsel worked on the case,[9] a deposition of the Commission would necessarily intrude upon the work product and deliberative process privileges. Kramer, however, sought to discover only the facts underlying the claim against him and not the mental impressions of Commission counsel. Rule 30(b)(6) contains no requirement that Kramer first seek by other means of discovery the facts underlying the claim against him. Under Rule 30(b)(6), the Commission could designate any person (i.e., someone other than counsel) to depose in response to Kramer's request. To the extent that Kramer's subsequent examination sought either the work product or mental impression of Commission counsel, the Commission's designated deponent retained the right to refuse to answer on the basis of privilege. Permitting the Commission in this instance to assert a blanket claim of privilege in response to a Rule 30(b)(6) notice creates an unworkable circumstance in which a

---

[9] The assertion, however, was not entirely accurate—the Commission's CPA, Fernando Torres, also worked on the investigation.

defendant loses a primary means of discovery without a meaningful review of his

opponent's claim of privilege.

Accordingly, because Magistrate Judge McCoun's order (Doc. 66) is clearly

erroneous, Kramer's objection (Doc. 69) is **SUSTAINED**, and the order (Doc. 66) is

**OVERRULED**.

*3. Other Pending Motions*

In Kramer's "omnibus motion in limine" (Doc. 145), Kramer requests (in addition to

the exclusion of Baker's statements) a prohibition on (1) the Commission's using or

relying upon certain declarations in support of summary judgment and (2) the

Commission's calling either Anderson or Torres as a witness at trial.  Kramer's first

request (Doc. 145) became moot upon denial of summary judgment and is therefore

**DENIED AS MOOT**.  Kramer's second request is also **DENIED AS MOOT**.

Kramer identifies his "motion to amend the pre-trial order" (Doc. 134) as a

pending matter.  To the extent that Kramer believes some matter in that motion remains

pending, the motion (Doc. 134) is **DENIED**.

The parties' stipulation at trial renders moot Kramer's motion (Doc. 172) to

"supplement" Kramer's motion in limine (Doc. 145) to the extent that Kramer seeks

exclusion of Torres's testimony.  Kramer objects (Doc. 172) to the Commission's calling

Torres as a witness based on the Commission's failure to disclose Torres as a witness.

Torres was a summary witness called to testify as a "human calculator" of the trades in

Kramer's brokerage account and the other amounts obtained by Kramer from Skyway.

A ruling on the request was reserved and the Commission permitted to proffer the

witness's testimony.  Subsequently, the parties stipulated to the amounts received by Kramer both in his brokerage account and in the form of periodic checks from Skyway. Accordingly, Torres's testimony is both unnecessary and irrelevant.  Kramer's requests (Doc. 172) (1) to prohibit the Commission's presenting Torres at trial and (2) to prohibit the Commission's presenting any other evidence at trial are **DENIED AS MOOT**. Kramer's request (Doc. 172) to strike the Commission's pleading is **DENIED**.  To the extent that Kramer sought any additional relief in his supplemental motion, each request is **DENIED**, except that Kramer retains his objection to the Commission's alleged discovery violations.

Kramer's third motion in limine (Doc. 180) is **GRANTED IN PART** and **DENIED IN PART**.  At trial, Kramer persuasively argued in favor of excluding the testimony of Steven Klein based on the Commission's failure to disclose Klein as a witness against Kramer on the pretrial witness list provided to, and approved by, Magistrate Judge McCoun.  Kramer's third request as to Torres is denied as moot, and Kramer's request as to both Brown and "any other witness" is **DENIED**.

Kramer's "motion in limine respecting the limits and parameters of 'relevancy' in connection with the upcoming bench trial" (Doc. 174) is **DENIED AS MOOT**.

<u>II. Findings of Fact & Conclusions of Law</u>

Kramer, a resident of Lake Worth, Florida, worked approximately forty years ago (beginning in 1969) "in the municipal bond business" as the vice-president of a company that sold municipal bonds.  Later, Kramer became the president of another company that sold municipal bonds.  Between 1976 and 1977, Kramer co-owned a company that

sold "London Commodity Options" until Congress prohibited sale of the options in the United States.  Kramer worked in the telecommunications industry and co-owned a company that installed telephone systems from 1982 to 1988.[10]  However, in 1988, Kramer pleaded guilty to a charge of wire fraud and conspiracy and later served twenty-eight months in prison.[11]  After his release in 1990, Kramer formed LCP Consultants, Inc.[12]

Twenty years ago, Kramer and the defendant Baker became business associates and began working on projects together.[13]  At the time of Kramer and Baker's collaboration, Baker owned at least two companies, Affiliated Holdings, Inc., and Worldwide Associates, Inc.[14]  To formalize their business relationship, Kramer and Baker executed a written agreement in August, 2003.  Kramer (as CEO of LCP Consultants) signed a "co[-]operative agreement" with Affiliated Holdings.[15]  Under the agreement, Kramer and Baker promised generally (1) to co[-]operate "in presenting to each other prospective merger and acquisition candidates, potential sources of investment and venture capital funding, and other forms of business opportunities . . . ."

---

[10] Jan. 18, 2011, (afternoon) Bench Trial Transcript ("TR") at 8-10, 17-19, 20-22; (Doc. 147-1); Jan. 19, 2011 (morning) TR at 79.

[11] Jan. 18, 2011, (afternoon) TR at 21-24.

[12] Jan. 18, 2011 (afternoon) TR at 24.

[13] Jan. 18, 2011 (afternoon) TR at 28-29, 82-83; Jan. 19, 2011 (afternoon) TR at 24.

[14] Jan. 18, 2011 (afternoon) TR at 29, 35; Exhibit 306.

[15] Ex. 307; Jan. 20, 2011, (morning) TR at 83-84.

and (2) to share any fee or "other compensation" resulting from "successful conclusion

of a business arrangement . . . ."[16]

Several months before signing the agreement with Kramer, Baker (in March,

2003) on behalf of Affiliated Holdings signed with Skyway Aircraft an agreement, in

which Skyway Aircraft agreed to pay Baker a five-percent commission (1) on capital

raised on behalf of the company, (2) on the purchase price of any acquisition or merger

resulting from Baker's introducing Skyway Aircraft and a third party, and (3) on the total

value of any contract brought to Skyway Aircraft by Baker.  James Kent, the CEO of

Skyway Aircraft, signed the agreement.[17]  Under the agreement, Baker facilitated a

"reverse merger"[18] between Skyway Aircraft and another entity, a so-called "public

---

[16] In 2005, Kramer and Baker entered another agreement entitled "consulting agreement" in which LCP Consulting (Kramer's company) retained Worldwide Associates (Baker's company) as a consultant. Ex. 306. Under the agreement, Worldwide Associates (designated as the "Consultant") agreed to perform certain consulting services, which consisted (in relevant part) of (1) presenting "prospective acquisition targets, business opportunities, joint ventures[,] and any other form of revenue enhancements" to the "Company," LCP Consulting; (2) assisting "in the implementation of short range and long term strategic planning to fully develop and enhance . . . assets, resources, products[,] and services" of LCP Consulting; and (3) advising as to "the continued development [of] a customer relations program and . . . stimulat[ing] interest in [LCP Consultants] by institutional investors and other members of the financial community." The consulting agreement obligated LCP Consultants to pay Worldwide Associates ten percent of any "funds raised or invested," the "purchase price of an[] acquisition or merger," or the "total value of a[] contract brought to [LCP Consultants]."

[17] Ex. 263; Jan. 21, 2011 (morning) TR at 58-59.

[18] In a "reverse merger," a privately held entity merges with a publicly traded "shell," and the merger renders publicly tradeable the private entity's shares.  S.E.C. v. Surgilight, Inc., 2002 WL 31619081, *1 n.1 (M.D. Fla. 2002) (Sharp, J.).  As S.E.C. v. M & A West, Inc., 2005 WL 1514101, *2 (N.D. Cal. 2005) (Walker, J.), explains:

> A "reverse merger," as used herein and in the parties' papers, is a transaction in which a private operating corporation (a "private" company) merges into a corporation whose stock has previously been offered to the public (a "public" company). Typically, the public company will at the time of the reverse merger be a "shell" company with minimal assets and liabilities and no actual operations. To complete the securities aspect of the reverse merger, the public shell company will exchange its treasury stock (along with, perhaps, shares from its stockholders) for

(continued...)

shell."[19]  Skyway Aircraft was "the corporation that was formed in order to roll into the

reverse merger," which resulted in Skyway Global LLC becoming the public company,

Skyway Communications Holding Corp ("Skyway") in 2003.[20]

    Before and after becoming a public company, Skyway retained an array of

"independent contractors," including Baker, to facilitate Skyway's finding "technology

programs"; potential merger or acquisition candidates; and "investment houses, venture

capital, wealthy individuals, [and] investment groups."[21]  Skyway provided each "finder"

a folder of information about the company and (based on successful performance of the

finder's agreement) compensation in Skyway shares.[22]  Brent Kovar, the president of

Skyway from 2003 to 2005,[23] met Baker after Baker (in 1998 or 1999) contacted Kovar's

former company.  Kovar understood that Baker was both a prospective investor and a

representative of investors, and hired Baker as a "finder" after Kovar became the

president of Skyway.

---

[18](...continued)
    all outstanding shares of the private company, and in consideration, the
    shareholders who control the public shell company will transfer most of their shares
    in the shell company to the owners of the private company. Often the public shell
    company will take on the name formerly used by the private company, and
    operations will carry on as before, except the formerly private company is now an
    issuer of publicly traded securities. The overall transaction thus provides a way for
    the private company effectively to offer its stock to the public.

[19] Jan. 21, 2011, (morning) TR at 83-84.

[20] Jan. 21, 2011, (morning) TR at 58-59, 4-5, 27; Jan. 21, 2011, (afternoon) TR at 24-25.

[21] Jan. 21, 2011, (morning) TR at 5-6.

[22] Jan. 21, 2011, (morning) TR at 6, 11-20.

[23] Jan. 21, 2011, (morning) TR at 4-5.

In mid-2003, Kovar met Kramer, who Kovar understood worked for Baker.[24]  As an employee of Baker's, Kramer contacted Kovar on a regular basis and sought press releases about Skyway and Skyway's accomplishments.  In response and if Skyway had issued a new press release, Kovar directed Kramer to Skyway's web site.  Kovar understood that Kramer assisted Baker in Baker's efforts for Skyway but lacked personal knowledge of the details of Kramer's conduct.[25]  Baker, on the other hand, became a trusted and driving force behind Skyway's business.  In addition to orchestrating the reverse merger, Baker introduced Skyway to broker-dealers and invited potential investors both to Skyway's aircraft demonstrations and to Skyway's headquarters.[26]

After Baker's introducing Kramer to Skyway in 2003, Kramer and Skyway (through Kent) developed an understanding that Skyway would pay Kramer for introducing a potential investor to Skyway if the potential investor decided to invest.[27] Shortly thereafter, Kramer introduced Nick Talib to Baker and Skyway.  A friend of Kramer's, Gary Johnson, became acquainted with Talib, who was a registered broker living in Arkansas and who sold Johnson shares of Skyway.  Talib eventually traveled to Florida, and Kramer drove Talib from the airport to a restaurant where Talib and Kramer met Baker.  Talib, Baker, and Kramer traveled to Skyway's headquarters and introduced Talib to Kovar.  After the introduction, Baker, Talib, and Kovar adjourned to a

---

[24] Jan. 21, 2011, (afternoon) TR at 10-12, 24-25, 109; Jan. 21, 2011, (morning) TR at 9-10, 37.

[25]  Jan. 21, 2011, (morning) TR at 9-10, 37, 42-45; Jan. 21, 2011, (afternoon) TR at 109-110.

[26] Jan. 21, 2011, (morning) TR at 20.

[27] Jan. 18, 2011, (afternoon) TR at 38-45; Ex. EE-1; Jan. 19, 2011, TR at 9.

conference room, and Kramer received a tour of Skyway's facility.  Talib eventually

raised approximately $14 million in capital for Skyway by selling shares of Skyway to

investors.[28]  As a result of Kramer's introducing Talib to Baker and Skyway, Skyway

paid Kramer between $189,000.00 and $200,000.00 in "the form of periodic checks."[29]

The first payment to Kramer from Skyway for the Talib introduction occurred in

December, 2003.[30]

Because Kramer thought that Skyway was a good investment and because Baker

asked Kramer to tell people about Skyway, Kramer (1) bought shares in Skyway

through his brokerage account and (2) encouraged certain others to read a press

release about Skyway and to visit Skyway's web site.  Thus, when Skyway issued a

press release, Kramer recommended that people read the press release.[31]  Kramer told

some of his friends, including Barry Krohn, Seymour Cohen, Bob Herko, Lino Morris,

Jeffrey Steinig, and Allen Katz,[32] about Skyway and shared his opinion that Skyway was

---

[28] Jan. 19, 2011, (afternoon) TR at 40-51, 55-58; Jan. 24, 2011, (morning) TR at 27-28; Jan. 20, 2011, TR at 61-63; Jan. 24, 2011, (afternoon) TR at 29-31; Jan. 21, 2011, (morning) TR at 40.

[29] Jan. 19, 2011, (afternoon) TR at 40-51, 55-58; Jan. 24, 2011, (morning) TR at 27-28; Jan. 20, 2011, TR at 61-63; Jan. 24, 2011, (afternoon) TR at 29-31; Ex. 453; Jan. 25, 2011, TR at 45.

[30] Jan. 19, 2011, (morning) TR at 54-56; Ex. 499; Ex. 303.

[31] Jan. 18, 2011, (afternoon) TR at 46-48; Jan. 19, 2011, (morning) TR at 27-29, 34-35; Ex. 303; Jan. 20, 2011, (morning) TR at 20-21.

[32] Jan. 18, 2011, (afternoon) TR at 46-48; Jan. 19, 2011, (morning) TR at 27-29, 34-35. Krohn and Kramer, friends since childhood, habitually speak on the phone at least once or twice a day.  Cohen and Kramer were partners in "the commodity business" and became friends in 1976.  Herko and Kramer met over forty years ago when Kramer was "in the municipal bond business" and became re-acquainted approximately ten years ago when Herko visited Florida.  After becoming re-acquainted, Herko and Kramer talked on the phone once or twice a week.  Morris and Kramer became friends fifteen years ago and speak on the phone once or twice a week.  Steinig and Kramer became friends thirty-two years ago. Jan. 19, 2011, (morning) TR at 92-98, 100-102, 103-104; Jan. 19, 2011, (afternoon) TR at 8-9, 13-16. Rohatynsky and Kramer became friends ten years ago and talk on the phone once a week, at most. Jan. 19, 2011, (afternoon) TR at 5-7, 93-98, 143-44.

a good investment.  For example, Katz (a retired employee of Oppenheimer) and Kramer (a long-time neighbor of Katz) often discussed investments.  Kramer told Katz that Kramer thought Skyway "might be a good deal" and that Kramer had visited Skyway's headquarters.  Katz later purchased shares of Skyway.  Kramer also talked about Skyway to his attorney, Allen Denowitz, and his doctor, Allen Sklover, both of whom later purchased shares.[33]  Kramer discussed Skyway with his two sons, one of whom purchased shares.[34]  Additionally, Cohen, Herko, Herko's son, Steinig, Steinig's brother, and Morris purchased Skyway shares.[35]  Krohn purchased Skyway shares after Kramer's mentioning Skyway to Krohn, Kramer's recommending that Krohn evaluate the company, and Krohn's reviewing information about Skyway.[36]  After purchasing shares, Krohn (similar to Kramer) talked to people about Skyway and directed people to Skyway's web site.  Based on Krohn's evaluation of Skyway, Krohn advised certain others that Skyway was both a good company and worth considering as an investment.[37]  Of the people with whom Krohn discussed Skyway, approximately four or five purchased shares.[38]  Each person (with whom either Kramer or Krohn spoke) purchased Skyway shares from a registered broker who received a commission based on the purchase.

---

[33] Jan. 19, 2011, (morning) TR at 27-29; Jan. 18, 2011, (afternoon) TR at 51-53; Ex. 502.

[34] Jan. 19, 2011, (afternoon) TR at 14-16.

[35] Jan. 20, 2011, (morning) TR at 10-14.

[36] Jan. 19, 2011,(afternoon) TR at 77-85; 150-53.

[37] Jan. 19, 2011, (afternoon) TR at 87-88.

[38] Jan. 19, 2011, (afternoon) TR at 104-05, 138.

At some point, Baker requested from Kramer information about (1) who purchased Skyway shares, (2) from whom the person purchased the Skyway shares, and (3) the number of shares purchased.  In exchange, Baker offered to pay Kramer twenty percent of the number of shares that each person bought.[39]  Accordingly, after Kramer's friends and acquaintances purchased shares through a registered broker, Kramer received from Baker (through Baker's company, Affiliated Holdings) additional shares in Skyway.  Similarly, after Cohen, Krohn, Herko, Steinig, and others talked to people about Skyway, each received from Baker additional shares of Skyway.[40]  For example, when Katz purchased shares in Skyway, Kramer reported Katz's purchase to Baker, and Kramer received from Baker additional shares of Skyway.  Similarly, when Krohn reported to Kramer (who reported to Baker) a purchase of Skyway shares, Krohn received from Baker additional shares of Skyway.[41]  Each report described purchases by individuals through registered brokers such as Scottrade, E*trade, and Merrill Lynch. The fax cover page of a report states that "the number below represents balance owed after stock delivery" and lists a number of shares "owed" followed by the name, address, and social security number of the recipient (e.g., Kramer, Cohen, Krohn, and others).[42]

---

[39] Jan. 19, 2011, (afternoon) TR at 33-35.  As to why Baker sought the reported information (and was willing to pay Kramer, Krohn, and others for the reports) neither Kramer nor Krohn provided an explanation, aside from Baker's requesting the information.  See, e.g., Jan. 19, 2011, (afternoon) TR at 161-63.

[40] Exs. 299, 399; Jan. 21, 2011, (morning) TR at 53-57.

[41] Jan. 18, 2011, (morning) TR at 13-14; Jan. 18, 2011, (afternoon) TR at 60-74, 94-95; Exs. 299, 399.

[42] Exs. 299, 399.

By the time Skyway petitioned for bankruptcy in 2005,[43] Kramer had earned approximately $700,000.00 from his Skyway shares,[44] and Krohn had earned approximately $75,000.00 from his Skyway shares.[45]  Kramer at no time either registered with the Commission or obtained a securities license.[46]

In this action, the Commission argues that Kramer acted as an unregistered broker of Skyway securities.  Section 15(a)(1) of the Exchange Act states (in pertinent part) that:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o.  "Broker" means "any person engaged in the business of effecting transactions in securities for the accounts of others."  15 U.S.C. § 78c.[47]  The Commission bears the burden of proving by a preponderance of the evidence a violation of Section 15(a).  S.E.C. v. Ginsburg, 362 F.3d 1292, 1298 (11th Cir. 2004).

---

[43]  Jan. 21, 2011, (morning) TR at 4-5.

[44]  Jan. 25, 2011, (morning) TR at 45-46.

[45]  Jan. 19, 2011, (afternoon) TR at 120.

[46]  Jan. 18, 2011, (afternoon) TR at 4; (Doc. 147-1); (Doc. 186).

[47]  The defendant agrees (Doc. 147-1) that this action involves a security (shares of Skyway), that Kramer's conduct involves the use of a "means or instrumentality of interstate commerce," and that Kramer never registered with the Commission.

The Exchange Act is intended "to protect investors . . . through regulation of transactions upon securities exchanges and in over-the-counter markets" against manipulation of share prices. Celsion Corp. v. Stearns Mgmt. Corp., 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976)). The broker-dealer registration requirement is "of the utmost importance in effecting the purpose[] of the [Exchange] Act," because registration facilitates both discipline "over those who may engage in the securities business" and oversight "by which necessary standards may be established with respect to training, experience, and records." Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co., 678 F.2d 552, 561 (5th Cir. 1982); Eastside Church of Christ v. Nat'l Plan, Inc., 391 F.2d 357, 362 (5th Cir. 1968).

Because the Exchange Act defines neither "effecting transactions" nor "engag[ing] in the business," an array of factors determines whether a person qualifies as a broker under Section 15(a). See DeHuff v. Digital Ally, Inc., 2009 WL 4908581, *3 (S.D. Miss. 2009) (Lee, J.). The most frequently cited factors, identified in S.E.C. v. Hansen, 1984 WL 2413, *10 (S.D.N.Y. 1984), consist of whether a person (1) works as an employee of the issuer, (2) receives a commission rather than a salary, (3) sells or earlier sold the securities of another issuer, (4) participates in negotiations between the issuer and an investor, (5) provides either advice or a valuation as to the merit of an investment, and (6) actively (rather than passively) finds investors. See also Cornhusker Energy Lexington, LLC v. Prospect St. Ventures, 2006 WL 2620985, *6 (D. Neb. 2006) (Bataillon, J.) (identifying as evidence of broker activity a person's "analyzing the financial needs of an issuer," "recommending or designing financing methods,"

discussing "details of securities transactions," and recommending an investment);
<u>S.E.C. v. Martino</u>, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (Pollack, J.); <u>S.E.C. v.
Margolin</u>, 1992 WL 279735 (S.D.N.Y. 1992) (Leisure, J.) (finding evidence of "brokerage
activity" in the defendant's "receiving transaction-based compensation, advertising for
clients, and possessing client funds and securities.").

 However, "[t]he factors articulated in <u>Hansen</u> . . . [a]re not designed to be
exclusive," <u>S.E.C. v. Benger</u>, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010) (Lefkow, J.), and
some factors (i.e., those factors typically associated with broker activity) appear more
indicative of broker conduct than others.  For example, <u>S.E.C. v. Bravata</u>, 2009 WL
2245649, *2 (E.D. Mich. 2009) (Lawson, J.), describes "[t]he most important factor in
determining whether an individual or entity is a broker" as the "regularity of participation
in securities transactions at key points in the chain of distribution."  (citing <u>Martino</u>, 255
F. Supp. 2d at 283); <u>see</u> <u>also</u> <u>S.E.C. v. Kenton Capital, Ltd.</u>, 69 F. Supp. 2d 1, 12-13
(D.D.C. 1998) (Kollar-Kotelly, J.) (describing "regularity of participation" as one of the
primary indicia of "engag[ing] in the business").[48]  <u>Cornhusker</u> describes "transaction-
based compensation" as "one of the hallmarks of being a broker-dealer."  2006 WL
2620985 at *6 (stating that "[t]he underlying concern has been that transaction-based
compensation represents a potential incentive for abusive sales practices that
registration is intended to regulate and prevent.").  In other words, transaction-based
compensation is the hallmark of a salesman.  By contrast, a person's recommending a

---

 [48]  A certain "regularity of participation" may arise from additional factors such as "the dollar
amount of securities sold" and "the extent to which advertisement and investor solicitation were used."  69
F. Supp. 2d at 12-13.

particular investment or participating in a negotiation typically occurs in an array of different commercial activities and professional pursuits, including brokering.

In <u>Hansen</u>, the defendant promoted and sold to the public fractional, undivided interests in various oil wells and received a fifteen percent commission for each interest that he sold.  The evidence established that the defendant (1) prepared letters that "extolled the virtues" of the investment; (2) advertised in newspapers; (3) sponsored seminars and social events; (4) distributed gifts, bumper stickers, and "other promotional items"; (5) participated in a financial symposium called "The Money Show" at the New York Coliseum; and (6) hired employees and provided prepared scripts for the employees' telephone calls to prospective investors.  The defendant engaged in promotional activity despite a permanent injunction against the defendant's violating the anti-fraud provisions of the securities laws (obtained by the Commission more than fifteen years earlier), the defendant's earlier and unsuccessful application for broker registration, and an explicit prohibition by several states against the defendant's engaging in the sale of securities without first registering as a broker.  Citing a lack of "extensive judicial interpretation," <u>Hansen</u> concludes that the defendant violated Section 15(a) based on the defendant's (1) working as a consultant rather than an employee of the issuer; (2) receiving a commission based on his sale of each oil well interest; (2) actively and aggressively seeking investors; (3) providing frequent and extensive advice as to the merit of the investment; (4) selling the securities of another issuer in the past; and (5) seeking and failing to obtain broker registration because of securities law violations.

In another case, S.E.C. v. Corporate Relations Group, Inc., 2003 WL 25570113 (M.D. Fla. 2003) (Antoon, J.), the Commission alleged that a "stock promotion firm" violated Section 15(a).  The firm "published investment-related material ranging from one-page faxes to the monthly full-color magazine, Money World" and, in exchange for a fee, agreed (1) to promote a security in one of the firm's publications, (2) to forward an investor inquiry about the security to a registered broker, and (3) to direct the firm's "broker relations executives" ("BREs") to both contact the registered broker and encourage the broker to sell the security.  According to two former BREs, the BREs also counseled an inquiring investor to purchase a security featured in the firm's publications.  If a BRE submitted proof that the investor purchased the security from a broker, the BRE received a commission from the firm based on the sale.  On summary judgment, Corporate Relations Group holds that the firm (not the BREs) acted as an unregistered broker in violation of Section 15(a), because the firm "actively sought investors, . . . recommended securities to investors through registered [brokers], and . . . [paid] transaction-based compensation for stock sales."

In contrast, S.E.C. v. M & A West, Inc., 2005 WL 1514101 (N.D. Cal. 2005) (Walker, J.), grants summary judgment sua sponte in favor of a defendant on the Commission's Section 15(a) claim.[49]  The undisputed facts established that the defendant facilitated and participated in reverse mergers.  Specifically, the defendant

_____

[49] On the Commission's Section 5(a) and Section 5(c) claims, M & A West grants summary judgment in favor of the Commission and subsequently grants in S.E.C. v. M & A West, Inc., 2005 WL 2988963 (N.D. Cal. 2005), the Commission's request for disgorgement, a civil penalty, and an injunction. The defendant appealed, and S.E.C. v. M & A West, Inc., 538 F.3d 1043 (9th Cir. 2008), affirms in part, reverses in part, and remands in part the subsequent order on the finding that factual disputes preclude judgment on the award of a second-tier penalty and an injunction.

worked with the shareholders of a private company (1) to identify "suitable public shell

companies," (2) to prepare documents for the reverse merger, and (3) to co-ordinate the

parties to the reverse merger.  Upon successful completion of a reverse merger, the

defendant received compensation in cash and securities.  Rejecting the Commission's

argument that the defendant's conduct amounted to broker activity, <u>M & A West</u> finds

that:

> Th[e] [Commission's] factual recitation capped with an ipse dixit
> sheds no light on why [the defendant]'s activities—commonly
> associated with paralegals (who draft documents), lawyers (who
> draft documents and orchestrate transactions), businessmen (who
> identify potential merger partners) and opportunists (who like to take
> a small cut of a big transaction), none of whom is commonly
> regarded as a broker—add up to [the defendant's] being a broker. In
> particular, no assets were entrusted to [the defendant], and the
> Commission identifies no evidence that he was authorized to
> transact "for the account of others" (aside from his fiduciary authority
> over [the] accounts [of entities controlled by him]). Although [the
> defendant] was in the business of facilitating securities transactions
> among other persons, the Commission cites no authority for the
> proposition that this equates to "effecting transactions in securities
> for the account of others."

Following <u>M & A West</u>, a series of cases identified a limited, so-called "finder's

exception" that permits a person or entity to "'perform a narrow scope of activities

without triggering the b[r]oker/dealer registration requirements.'" <u>Salamon v. Teleplus

Enterprises, Inc.</u>, 2008 WL 2277094, *8 (D.N.J. 2008) (Walls, J.) (quoting <u>Cornhusker</u>,

2006 WL 2620985 at *6); <u>Salamon v. CirTran Corp.</u>, 2005 WL 3132343, *2-*3 (D. Utah

2005) (Stewart, J.).  "Merely bringing together the parties to transactions, even those

involving the purchase and sale of securities, is not enough" to warrant broker

registration under Section 15(a).  <u>Apex Global Partners, Inc. v. Kaye/Bassman Intern.</u>

Corp., 2009 WL 2777869, *3 (N.D. Tex. 2009) (Lynn, J.).  Rather, the evidence must

demonstrate involvement at "key points in the chain of distribution," such as

participating in the negotiation, analyzing the issuer's financial needs, discussing the

details of the transaction, and recommending an investment.  Cornhusker, 2006 WL

2620985 at *6.  Even if the "finder" receives a fee "in proportion to the amount of the

sale"—i.e., a percentage of the total payment rather than a flat fee—the Commission (in

a series of "no-action" letters)[50] "has been willing to find that there was no need for

registration . . . ."  DAVID A. LIPTON, 15 BROKER-DEALER REGULATION § 1:18 (explaining,

however, that payment of a flat fee "does not insure that the payment will be regarded

as non[-]commission compensation."); but see Brumberg, Mackey & Wall, P.L.C., SEC

No-Action Letter, 2010 WL 1976174 (May 17, 2010) (stating that "any person receiving

transaction-based compensation in connection with another person's purchase or sale

of securities typically must register as a broker-dealer or be an associated person of a

registered broker-dealer.").  The distinction between a finder and a broker, however,

remains largely unexplored, and both the case law and the Commission's informal, "no-

action" letter advice is highly dependent upon the facts of a particular arrangement.[51]

---

[50] A "no-action" letter is a method of seeking advice from the Commission's staff on compliance with the securities laws.  A "no-action" letter is informal and possesses no binding legal authority.  See http://www.sec.gov/interps.shtml.

[51] For example, in the Brumberg "no-action" letter, the Commission considered the implication under Section 15(a) of a potential agreement between an issuer and law firm.  Under the agreement, the law firm promised to introduce to the issuer—in exchange for a percentage of the capital raised by the introduction—persons who "may have an interest" in investing in the issuer.  The Commission assumed that, by introducing only a person with a potential interest in investing in the issuer, the law firm would engage in both "pre-screening" and "pre-selling" to determine the eligibility to purchase and the interest level of a potential investor.  The law firm's receiving "compensation directly tied to successful investments" in the issuer would result in (1) the law firm's possessing "a 'salesman's stake'" in the proposed transaction and (2) a "heightened incentive for [the law firm] to engage in sales efforts."  Thus, the Commission advised the law firm that the proposed conduct likely required registration under Section 15(a).

(continued...)

Both <u>Teleplus Enterprises</u> and <u>Cornhusker</u> involve a claim to rescind a contract based on a violation of Section 15(a) and deny summary judgment based on conflicting evidence of broker conduct.  In <u>Teleplus Enterprises</u>, the parties disputed whether a consultant hired by an issuer qualified as a "finder" or as an unregistered broker.  The issuer argued that the consultant qualified as a broker because the consultant (1) claimed a ten-percent commission based on financing received by the issuer as a result of the consultant's finding an investor for the issuer, (2) solicited potential investors, (3) participated in negotiations, and (4) provided advice to the issuer.  The consultant asserted that he participated neither in negotiating nor in structuring the deal after the consultant introduced the investor to the issuer.  In <u>Cornhusker</u>, a consultant agreed to find financing for a proposed project involving an ethanol facility.  <u>Cornhusker</u> identifies a "narrow scope of activit[y]" that distinguishes a finder from a broker and finds that determining whether the defendant engaged in broker activity requires consideration of the "nature, extent, and timing of the activit[y] undertaken by [the consultant] and its agents."

In the trial of this action, the Commission argued that Kramer's conduct qualified as broker activity subject to Section 15(a) because Kramer (1) received transaction-

---

[51](...continued)

In reviewing the Commission's "no-action" letters, Lipton describes the difficulty in ascertaining from "no-action" letters the factual distinction between a broker and a finder.  According to Lipton, "[s]ince the staff frequently does not explain the basis of its no-action position, it is often difficult to ascertain precisely which factors trigger do or do not trigger the stance to which the staff will adhere. Without an interchange between the staff and the inquirer, it is also frequently difficult to discern why an inquirer thought that a particular request might have been treated differently than past inquiries of a similar nature." DAVID A. LIPTON, 15 BROKER-DEALER REGULATION § 1:18.

based compensation, (2) actively solicited investors (by distributing promotional material and directing people to Skyway's web site), (3) advised investors about Skyway (by telling people that Skyway was a good company and suggesting that people read Skyway's press releases), (4) used a "network" of associates to promote Skyway, (5) demonstrated a regularity of participation (through the money that Kramer earned and the two-years over which the conduct occurred), (6) promoted the shares of other issuers, and (7) earned commissions rather than a salary as a Skyway employee.  In response, Kramer asserted that Kramer (1) never sold a share of stock, (2) never "engaged in the business of effecting securities transactions for the accounts of others," (3) talked about investments in the manner that people talk about sports or politics, (4) talked to only some of Kramer's relatives and close friends about Skyway, (5) acted as a finder by introducing Talib to Skyway, and (6) reported purchases of Skyway shares to Baker because Baker requested the information and because Baker agreed to pay Kramer (with Baker's Skyway shares) for collecting the information.

The Commission called as witnesses Kramer, Krohn, and Kovar.  Kramer stipulated to the truth of his 2006 deposition testimony, and testified consistently with his earlier statements as to certain, pertinent facts on direct, cross-, and re-direct examination.  Kramer stipulated to receiving payment from Skyway as a result of the Talib introduction and admitted receiving shares of Skyway from Baker based on Kramer's reports to Baker of Skyway purchases.  Kramer admitted telling his friends and intimates about Skyway (to generate "market awareness") and directing attention to Skyway's web site and press releases.  However, Kramer repeatedly disputed the

Commission's use of the term "network" to refer to his friends and denied that any of Kramer's agreements with Baker pertained to Skyway or to Kramer's reports to Baker.

Krohn was a key witness for the Commission.  Krohn was the only person to testify that Kramer told him about Skyway, that Kramer directed him to Skyway's web site, and that, as a result, he purchased Skyway shares.  Krohn is also Kramer's childhood friend and daily contact.

More distinctly than other witnesses, Kovar answered directly, consistently, and creditably throughout a day and a half of examination.  Kovar's testimony largely confirmed certain aspects of Kramer's testimony, such as Kramer's limited role in the Talib introduction and Kramer's working as an employee of Baker and not as either an employee or consultant of Skyway.  At certain points, however, Kovar (with convincing sincerity) lacked sufficient memory to testify conclusively to certain facts.  For example, Kovar recalled Kramer's presence during the introduction that led to Skyway's reverse merger, but Kovar could not remember Kramer's presence during the Talib introduction. Kovar initially stated that he mailed boxes of Skyway promotional material directly to Kramer but later said that he in fact mailed the material to Affiliated Holdings, Baker's company.  Kovar could not definitively recall any detail of the Skyway promotional material mailing, i.e., to whom, how often, in what quantity, or upon whose request.[52] On the other hand, Kovar consistently asserted that Kramer called Kovar on several occasions (more frequently as Skyway approached bankruptcy) and sought both information and Skyway's latest press release.

---

[52] The fact of Kramer's requesting, receiving, and distributing Skyway promotional material was otherwise unsupported by admissible evidence.

Kramer received so-called transaction-based compensation in two distinct instances.  The first instance involved Nick Talib.  Skyway hired Baker as an independent contractor to facilitate Skyway's finding both a potential merger or acquisition candidate and other financing.  As a developing company, Skyway hired many independent contractors to find both financing and technology.  Skyway never hired Kramer.  However, after Baker informed Kramer about Skyway, Kramer developed an understanding that Kramer would receive compensation for Kramer's introducing a potential investor to Skyway.  Additionally, Baker and Kramer had an ongoing business relationship governed by a "co-operative agreement," which obligated each party to share a potential business opportunity and any resulting compensation.  When Kramer's friend, Gary Johnson, told Kramer about Talib (a registered broker) and Talib's interest in Skyway, Kramer arranged a meeting between Talib, Baker, and Skyway.  The evidence establishes that the extent of Kramer's involvement in the Talib transaction consisted of arranging the meeting and providing transportation for Talib from the airport to Skyway's headquarters.  Talib eventually raised a substantial amount of financing for Skyway by selling shares to investors, and both Baker and Kramer received a payment from Skyway based on the success of the introduction.

In this instance, Kramer's conduct consisted of nothing more than bringing together the parties to a transaction.  The Commission presented no evidence that Kramer either participated in the negotiation, discussed the detail of the transaction, analyzed the financial status of Skyway, or promoted an investment in Skyway to Talib or to Talib's investors.  In fact, the evidence shows that, after introducing Talib to Baker

and driving Talib to Skyway's headquarters, Kramer received a tour of the facility while

Baker and Kovar adjourned to a conference room with Talib.  Kramer's minimal

involvement in the Talib transaction is not susceptible to the description "engaged in the

business of effecting transactions in securities for the accounts of others."  No evidence

shows that Kramer possessed authority over the accounts of others or sought to

influence Talib's authority over the accounts of others.  In fact, the Commission

presented evidence neither of Kramer's communicating with Talib (beyond facilitating

the introduction to Skyway) nor of Kramer's communicating with Talib's investors about

Skyway.  Rather, the only available inference from the evidence is that Talib sought an

introduction to Skyway, Talib convinced investors to entrust him with assets, Talib

effected securities transactions for those investors, and Talib earned commissions.

Kramer's introduction of Talib was an ephemeral, remote, and isolated initiative.

Kramer's receiving transaction-based compensation for introducing Talib to Skyway

cannot, without additional evidence, qualify Kramer a broker under Section 15(a).

Kramer also received compensation from Baker based on Kramer's reporting to

Baker purchases of Skyway shares.  The Commission argues (1) that Kramer received

compensation because Baker directed Kramer to promote Skyway; (2) that, to

accomplish the task, Kramer employed a "network" of associates to promote Skyway

shares; and (3) that, in turn, Kramer (and each of his associates) received Skyway

shares upon proof that a purchase occurred.

The evidence shows that Kramer told a small but close group (each susceptible to

description as a either a friend or an intimate) about Skyway and opined that Skyway

seemed like a good investment.  According to the Commission, the nature of Kramer's relationship with each person is irrelevant to the broker analysis under Section 15(a). However, the broker analysis under Section 15(a) (as developed in <u>Hansen</u>, <u>Martino</u>, and other cases) permits examination of a wide array of factors, including those factors already identified in applicable precedent.  In the absence of a statutory definition of either "effecting securities transactions" or "engaged in the business," certain factors determine whether a person qualifies as a broker.  One factor may evidence broker activity while another factor suggests the absence of broker activity.  Accordingly, the nature of a person's relationship with another (although not determinative, of course) may support either the absence or the presence of broker activity.

In this instance, the evidence establishes that Kramer discussed Skyway with his lawyer, his doctor, Krohn, Cohen, Herko, Morris, Steinig, Katz, and his son.  The full measure of Kramer's "advice" to, or "solicitation" of, this array of Kramer's intimate friends and family consisted of Kramer's (1) sharing his opinion that Skyway was a good company and a good investment and (2) directing attention to Skyway's web site and press releases.  Some of Kramer's intimate friends and family (1) purchased Skyway shares and (2) talked to other people about Skyway.  Baker, whom Skyway retained as a consultant, requested that Kramer collect and send to Baker reports of purchases of Skyway shares.  In exchange for the reports, Baker paid Kramer and some of Kramer's intimate friends with Baker's shares of Skyway.[53]  Odd, but true.  Odd, but not "broker" activity.

---

[53] Neither Kramer nor Krohn could articulate the reason for Baker's requesting the reports, which contain information likely available from a better source for a lesser or no charge.

The Commission presented no additional, admissible evidence that Kramer either (1) sold a share of Skyway; (2) participated in the purchase and sale of a Skyway security; (2) provided advice or other information about the investment; (3) advertised or distributed promotional material for Skyway; (4) sponsored a seminar or social event at which Kramer promoted Skyway; (5) sold the security of another issuer; (6) hired employees to contact potential investors about Skyway; (7) called a potential investor (i.e, someone other than one of Kramer's intimate friends); or (8) encouraged a broker to sell Skyway securities.  Rather, the Commission's evidence against Kramer leads inexorably to the conclusion (1) that, at most, Kramer (and Krohn and others) exhibited conduct similar to an associated person of an unregistered broker and (2) that in this instance the unregistered broker, if anyone, was either Bruce Baker or Baker's company, Affiliated Holdings.  Baker executed a written contract with Skyway to find financing for Skyway; Baker promoted Skyway to Kramer, Talib, and others; Baker became intimately involved in Skyway's financial transactions, including the Talib transaction and the reverse merger; Baker received transaction-based compensation from Skyway; and Baker paid Kramer, Krohn, and others to tell people about Skyway and to send reports of Skyway share purchases.

This instance is analogous to Corporate Relations Group to the extent that, through Affiliated Holdings, Baker (similar to the firm in Corporate Relations Group) (1) agreed for a fee to promote an issuer's securities, (2) forwarded an investor inquiry either to a broker or directly to the issuer, and (3) hired employees to help accomplish each task.  However, unlike the BREs in Corporate Relations Group, Kramer, Krohn,

and the others who received payments from Baker neither (1) contacted a broker and encouraged the broker to sell Skyway securities, (2) fielded investor inquiries, nor (3) counseled an investor to purchase shares of Skyway.  Nonetheless, assuming that Kramer's sharing his opinion—that Skyway was a "good company" and a "good deal"—equates to investment advice, the Commission presents insufficient evidence from which to conclude that Kramer's conduct in this instance is somehow materially different from a BRE in Corporate Relations Group.  In other words, Corporate Relations Group found that the firm—not a BRE—acted as an unregistered broker and, in this instance, the evidence against Kramer fails to show conduct comparable (either in nature or in extent) to either the firm or the BREs in Corporate Relations Group.

In sum, neither applicable precedent nor the statutory language permits the conclusion, based on the admissible evidence presented in this action, that Kramer acted as an unregistered broker in violation of Section 15(a).[54]  In this instance, the Commission fails to show by a preponderance of the evidence that Kramer "engaged in the business of effecting transactions in securities for the accounts of others."

---

[54] At trial, the Commission presented the 2010 Brumberg, Mackey & Wall no-action letter in which the Commission opines that the receipt of transaction-based compensation in connection with a securities transaction (without more) triggers the broker registration requirement.  To Commission's position in 2010 (which is neither legally binding nor persuasive), cannot serve ex post facto as the basis for condemning conduct that occurred from 2003 to 2005.  Furthermore, the Commission's proposed single-factor "transaction-based compensation" test for broker activity (i.e., a person "engaged in the business of effecting transactions in securities for the accounts of others") is an inaccurate statement of the law both in 2003 and in 2011.  As this order exhaustively explains, an array of factors determine the presence of broker activity.  In the absence of a statutory definition enunciating otherwise, the test for broker activity must remain cogent, multi-faceted, and controlled by the Exchange Act.

Conclusion

Accordingly, as to the pending motions (1) Kramer's motion in limine (Doc. 145) is **GRANTED** as to the statements of Bruce Baker and is otherwise **DENIED AS MOOT**; (2) Kramer's objection (Doc. 69) to Magistrate Judge McCoun's order (Doc. 66) is **SUSTAINED** and the order (Doc. 66) is **OVERRULED**; (3) Kramer's motion (Doc. 134) to amend the pretrial order is **DENIED** to the extent that any matter remains pending; (4) Kramer's motion (Doc. 172) to supplement his motion in limine is **DENIED AS MOOT** as to Torres and is otherwise **DENIED**; (5) Kramer's relevancy motion (Doc. 174) is **DENIED AS MOOT**; (6) Kramer's third motion in limine (Doc. 180) is **DENIED IN PART** and **GRANTED IN PART**; and (7) Kramer's motion (Doc. 196) for a directed verdict is **DENIED**.  Kramer's motion (Doc. 188) for sanctions is **REFERRED** in accord with 28 U.S.C. § 636 to Magistrate Judge Thomas B. McCoun, III, for a report and recommendation.  Kramer's unopposed motion (Doc. 205) to exceed the page limitation in filing a "omnibus motion" for sanctions is **REFERRED** for disposition to Magistrate Judge McCoun.  The Clerk is directed to enter a judgment in favor of the defendant Kenneth R. Kramer and against the Commission.

ORDERED in Tampa, Florida, on April 1, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE